COMMONWEALTH of Pennsylvania,
Appellee,

v.

Montez HARRIS, Appellant.

Superior Court of Pennsylvania.

Argued Feb. 15, 2005.
Filed Sept. 30, 2005.

Stephen P. Patrizio, Philadelphia, for appellant.

Eva Robertson, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: GANTMAN, PANELLA, and OLSZEWSKI, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, Montez Harris, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his convictions for first degree murder,[1] possessing instruments of crime ("PIC")[2] and carrying firearms on public streets in Philadelphia.[3] Appellant asks us to review the trial court's ruling on Appellant's motion *in limine* to bar the use of his prior *crimen falsi* convictions for impeachment purposes if Appellant decided to testify at trial; whether the Commonwealth committed numerous instances of prosecutorial misconduct which constitute reversible error; and, whether the trial court erred in allowing the Commonwealth to use a videotape without a cautionary instruction to the jury. We hold the trial court correctly decided to allow evidence of Appellant's prior *crimen falsi* convictions, if Appellant took the stand in his own defense at trial; Appellant is not entitled to a new trial on his claims of prosecutorial misconduct; and, a cautionary instruction with regard to the videotape was not necessary in the instant case. Accordingly, we affirm.

¶ 2 The relevant facts and procedural history of this appeal are as follows. On March 24, 2001, Melvin Brown ("Decedent") and Wallace Alexander left an after-hours club located on 53rd Street and Woodland Avenue in Philadelphia. As Decedent and Alexander walked to their car, a man wearing a yellow hooded sweatshirt followed them. Alexander watched the man draw a gun. As Alexander ran away, he heard gunshots. Alexander turned around and saw Decedent lying in the street. Decedent died as a result of seven gunshot wounds. The police recovered twelve shell casings from the scene.

¶ 3 On the night of the shooting, Officers Joy Gallen–Ruiz and Raymond Rutter patrolled the area between 52nd and 58th Streets. The officers heard gunshots coming from 53rd Street and Woodland Avenue. As the officers proceeded westbound on Woodland Avenue toward 53rd Street, they saw Appellant running across Woodland Avenue toward 53rd Street. Appellant wore a yellow hooded sweatshirt. At the same time, Officer Rutter noticed Decedent's body in the street. The officers followed Appellant and watched him toss an object from his left side. Subsequently, the officers stopped and frisked Appellant. Officer Rutter found a pair of black gloves in Appellant's back right pocket. Officer Rutter also found the object Appellant had tossed away earlier, a silver semiautomatic handgun, on the property at 1729 South 53rd Street. After recovering the handgun, the officers arrested Appellant.

¶ 4 On January 20, 2004, the court conducted a pre-trial hearing. At that time, defense counsel asked the court for a ruling on the admissibility of Appellant's prior convictions as impeachment evidence. Specifically, defense counsel informed the court that Appellant had been convicted of robbery and burglary in 1984. Appellant was released from prison for these offenses in 1993. Defense counsel sought to preclude the Commonwealth from attack-

---

1. 18 Pa.C.S.A. § 2502(a).

2. 18 Pa.C.S.A. § 907.

3. 18 Pa.C.S.A. § 6108.

ing Appellant's credibility by questioning him about these crimes. The court, however, determined that evidence of these convictions was highly probative and therefore admissible, in the event Appellant decided to testify, because Appellant's credibility was central to the case.

¶ 5 Trial commenced on January 21, 2004. At trial, an expert for the Commonwealth testified that the twelve shell casings found at the crime scene were discharged from the handgun found at 1729 South 53rd Street. As part of its case-in-chief, the Commonwealth also introduced into evidence a surveillance tape from a security camera affixed to a building at 53rd Street and Woodland Avenue. This tape depicted Appellant, in his yellow hooded sweatshirt, crossing 53rd Street, pulling an object from his back pocket, standing over Decedent's body and then running across Woodland Avenue. Officers Ruiz and Rutter testified that Appellant was the individual in the video.

¶ 6 The defense called Detective Thomas Kane to testify. Detective Kane investigated Decedent's homicide case. On direct examination, defense counsel asked Detective Kane whether Decedent's murder "was some type of payback" in retaliation for another shooting. (*Id.* at 165). Detective Kane testified that an individual named Jody Satchell had been murdered approximately three weeks before Decedent, and Decedent was a suspect in the murder. (*Id.* at 173). Detective Kane also stated that Appellant lived with Mr. Satchell's aunt. (*Id.*)

¶ 7 The jury convicted Appellant of first degree murder, PIC and the firearms offense. Appellant did not file post-trial motions. The court sentenced Appellant to life imprisonment for first degree murder. Additionally, the court sentenced Appellant to one to two years' imprisonment for the firearms offense and one to two years'

imprisonment for PIC, to be served consecutive to the life sentence. This timely appeal followed. On May 19, 2004, Appellant timely filed his court-ordered Rule 1925(b) statement.

¶ 8 Appellant raises eight issues for our review:

WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR THROUGH ITS PRETRIAL RULING THAT A TWENTY YEAR OLD CONVICTION FOR ROBBERY AND BURGLARY THAT WAS COMMITTED WHEN [APPELLANT] WAS ONLY FIFTEEN YEARS OF AGE COULD BE USED TO IMPEACH HIM IF HE TESTIFIED?

WHETHER A NEW TRIAL IS WARRANTED BASED UPON QUESTIONING BY THE PROSECUTOR AND PROSECUTORIAL MISCONDUCT WHEREBY THE JURY WAS ADVISED THAT [APPELLANT] REFUSED TO MAKE A STATEMENT AFTER THE HOMICIDE WHEN QUESTIONED BY DETECTIVES AND THROUGH REFERENCE TO [APPELLANT'S] POST–ARREST SILENCE?

WHETHER THE COMMONWEALTH WITHHELD CRITICAL DISCOVERY INVOLVING FINGERPRINT LIFTS IN VIOLATION OF *BRADY,* THE PENNSYLVANIA RULES OF CRIMINAL PROCEDURE AND [APPELLANT'S] CONSTITUTIONAL RIGHTS?

WHETHER PROSECUTORIAL MISCONDUCT RESULTING IN REVERSIBLE ERROR AND A MISTRIAL OCCURRED THROUGH MISINFORMATION WHICH LED THE JURY TO INFER THAT THE DECEDENT MURDERED A COUSIN OF [APPELLANT]?

WHETHER PROSECUTORIAL MISCONDUCT AND REVERSIBLE ER-

ROR OCCURRED THROUGH UNSUBSTANTIATED STATEMENTS BY THE PROSECUTOR ABOUT HIS EXPERIENCE INVOLVING EVIDENCE IN OTHER CASES THROUGHOUT HIS CAREER AND THROUGH PERSONAL OPINIONS AS TO THE GUILT OF [APPELLANT]?

WHETHER PROSECUTORIAL MISCONDUCT AND REVERSIBLE ERROR OCCURRED THROUGH REPETITIVE PERSONAL ATTACKS UPON DEFENSE COUNSEL, ACCUSATIONS THAT DEFENSE COUNSEL WAS HIDING EVIDENCE, AND THROUGH THE PROSECUTOR'S REPREHENSIBLE CONDUCT WHICH UNDERMINED [APPELLANT'S] RIGHT TO A FAIR TRIAL?

WHETHER PROSECUTORIAL MISCONDUCT AND REVERSIBLE ERROR OCCURRED WHEN THE PROSECUTOR ADVISED THE JURY WITHOUT ANY BASIS THAT WALLACE ALEXANDER DID NOT WANT TO PROVIDE INFORMATION AGAINST THE ASSAILANT BECAUSE HE WAS THREATENED?

WHETHER THE TRIAL COURT COMMITTED ERROR BY ALLOWING THE PROSECUTION TO RELY UPON A VIDEOTAPE, AND TO DO SO WITHOUT ANY FORM OF CAUTIONARY/*KLOIBER* INSTRUCTION?

(Appellant's Brief at 3–4).

■ ¶ 9 In issue one, Appellant asserts the trial court issued a pre-trial ruling which determined that evidence of his 1984 convictions for robbery and burglary could be used to impeach Appellant, if he decided to testify at trial. Appellant contends he decided not to testify because he did not want to bring these offenses to the attention of the jury. Appellant insists, however, that Pennsylvania Rule of Evidence 609 prevents the use of his prior convictions as impeachment evidence where the convictions at issue were more than ten years old. Appellant further contends the convictions were subject to the Rule 609 balancing test; had the court applied the test properly, the end result would have been in Appellant's favor and against admissibility. Appellant concludes the trial court erred in its pre-trial evidentiary ruling, and he is entitled to a new trial.[4] We disagree.

■ ¶ 10 "Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion." *Commonwealth v. Hyland*, 875 A.2d 1175, 1185–86 (Pa.Super.2005) (quoting *Commonwealth v. Hernandez*, 862 A.2d 647, 650 (Pa.Super.2004)). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Hyland, supra* at 1186 (quoting *Commonwealth v. Carter*, 861 A.2d 957, 961 (Pa.Super.2004) (*en banc*)).

4. Appellant also argues Rule 609 requires written notification of the Commonwealth's intent to use the prior criminal acts for impeachment, and the Commonwealth did not provide such notice in this case. (Appellant's Brief at 10). Appellant, however, did not raise this argument before the trial court or in his court-ordered Rule 1925(b) statement. Accordingly, we will not address this argument on appeal. *See Commonwealth v. Melendez–Rodriguez*, 856 A.2d 1278 (Pa.Super.2004) (*en banc*) (reiterating issues not raised before trial court are waived and cannot be raised for first time on appeal).

¶ 11 Pennsylvania Rule of Evidence 609 provides, in pertinent part:

### Rule 609. Impeachment by evidence of conviction of crime

(a) **General Rule.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, shall be admitted if it involved dishonesty or false statement.

(b) **Time Limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein in not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Pa.R.E. 609(a)-(b). Robbery and burglary are considered *crimen falsi* and convictions for these offenses are admissible for impeachment purposes. *Commonwealth v. Jackson*, 526 Pa. 294, 585 A.2d 1001 (1991); *Commonwealth v. Gordon*, 355 Pa.Super. 25, 512 A.2d 1191 (1986).

¶ 12 Further, the following factors should be considered when analyzing the admissibility of prior convictions governed by Rule 609:

1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; 2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; 3) the age and circumstances of the defendant; 4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and 5) the existence of alternative means of attacking the defendant's credibility.

*Commonwealth v. Randall*, 515 Pa. 410, 413, 528 A.2d 1326, 1328 (1987).

¶ 13 Instantly, Appellant was convicted of robbery and burglary in 1984, when he was fifteen years old. Because he was certified as an adult, the convictions count as adult convictions. Robbery and burglary are *crimen falsi*. Therefore, Appellant's convictions were admissible under Rule 609(a). *See Jackson, supra; Gordon, supra.* After serving time on these convictions, Appellant was released from prison in 1993. Appellant's present trial for murder began in January 2004. Although barely more than ten years had passed since Appellant's release from prison on the prior *crimen falsi*, the admissibility of his prior convictions was subject to the Rule 609 balancing test enunciated in *Randall, supra*. Under factors one and two Appellant's prior convictions do not suggest a propensity to commit murder, the charge for which he was currently being tried. Under factor three, Appellant was fifteen years old when he committed the offenses at issue. However, he was certified for trial on those crimes as an adult. Moreover, the ten-year period dating from his release from prison on his prior *crimen falsi* had not expired when he

committed the instant murder on March 24, 2001. Appellant's trial was delayed almost three years. Thus, the time from his release on the prior crimes was artificially increased by three years. Under factor four, the strength of the Commonwealth's case as compared to the defense fundamentally turned on the credibility of the witnesses at trial. Under factor five, the certified record reveals no adequate alternative grounds for Appellant's impeachment. Thus, our review of the *Randall* factors indicates the trial court correctly decided to admit the evidence of Appellant's prior convictions, if Appellant took the stand in his own defense at trial. *See id. See also Commonwealth v. Osborn*, 364 Pa.Super. 505, 528 A.2d 623 (1987), *appeal denied*, 523 Pa. 641, 565 A.2d 1166 (1989) (holding evidence of defendant's prior perjury conviction was admissible in prosecutions for rape and terroristic threats to impeach defendant's credibility, under analysis of relevant factors).

¶ 14 The trial court explained its decision as follows:

In the present case, [Appellant's] credibility was a critical issue. As this court noted:

[Y]ou raise the credibility of the police officers are [sic] an issue versus the credibility of [Appellant]. Under those circumstances, you know, given the fact that credibility is the central issue in this case here, I think it would be highly probative for the jury to know about the—about the burglary and the robbery....

(N.T. Trial, 1/20/04, 15–16). Considering the importance of [Appellant's] credibility and the limited prejudice, the probative value of the 1984 conviction substantially outweighed any potential prejudicial effect. Thus, evidence of that conviction was admissible to impeach [Appellant's] credibility.

(Trial Court Opinion, filed June 3, 2004, at 9) (internal quotation marks omitted). In light of the applicable standard of review and relevant case law, we decline to disturb the court's decision on Appellant's request to bar evidence of his prior convictions if he decided to testify at trial. *See Hyland, supra.*

¶ 15 In issues two, four, five, six and seven, Appellant raises various claims of prosecutorial misconduct. Appellant's claims fall into two categories: 1) misconduct related to the prosecutor's questioning of the witnesses, and 2) misconduct related to the prosecutor's closing argument. Specifically, Appellant insists the prosecutor improperly introduced testimony regarding Appellant's post-arrest silence. Appellant also complains the prosecutor made statements which misinformed the jury about a potential motive for Appellant to murder Decedent.

¶ 16 Appellant further contends that, during closing argument, the prosecutor: 1) improperly referenced Appellant's pre-arrest silence; 2) made inappropriate statements about his opinion as to Appellant's guilt; and 3) conducted personal attacks against defense counsel.[5] Appellant concludes this Court must overturn his conviction due to these "multiple

---

**5.** Appellant also alleges prosecutorial misconduct for comments which suggested that Mr. Alexander was threatened not to testify. Appellant argues these comments caused the jury to believe Appellant threatened Mr. Alexander. (Appellant's Brief at 23). However, Appellant failed to object to these statements at trial. Accordingly, this issue is waived for purposes of appellate review. *See Commonwealth v. Duffy*, 832 A.2d 1132 (Pa.Super.2003), *appeal denied*, 577 Pa. 694, 845 A.2d 816 (2004) (holding party must make timely and specific objection at trial to preserve issue for appellate review).

intentional instances of prosecutorial misconduct." (Appellant's Brief at 29). In the alternative, Appellant asks us to order a new trial. We disagree.

■ ¶ 17 Our standard of review for a claim of prosecutorial misconduct is limited to "whether the trial court abused its discretion." *Commonwealth v. DeJesus*, 567 Pa. 415, 438, 787 A.2d 394, 407 (2001), *cert. denied*, 537 U.S. 1028, 123 S.Ct. 580, 154 L.Ed.2d 441 (2002).

> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [Appellant] so that they could not weight the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

*Id.* at 438, 787 A.2d at 407–08 (internal citations omitted). *See also Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898 (2004) (holding prosecutor's comments during closing argument of murder trial were not improper when made in response to mitigation evidence presented by defendant). "In considering [an] appellant's claims of prosecutorial misconduct, we note that a prosecutor's comments do not constitute evidence." *Commonwealth v. Baez*, 554 Pa. 66, 103, 720 A.2d 711, 729 (1998), *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999).

■ ¶ 18 In cases where an appellant alleges that his Fifth Amendment right to remain silent was improperly referenced at trial, the Pennsylvania Supreme Court has emphasized "the mere revelation of silence does not establish innate prejudice." *Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822, 833 (2005) (quoting *Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329, 336–37 (2005)).

> [T]he United States Supreme Court also has recognized that a defendant's silence may bear relevance to, and be admissible to establish, other issues arising in a criminal proceeding. For example, in *United States v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), the Court ruled there is no Fifth Amendment proscription precluding the raising of silence in fair response to defense argumentation. The case concerned a challenge to a prosecutor's reference to the defendant's silence at trial in response to defense arguments that the government had not allowed the defendant to explain his side of the story. Specifically, during his summation, the prosecutor informed the jury that the defendant "could have taken the stand and explained it to you." *Robinson* first noted that "the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his conduct." The Court recognized [*Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and its] proscription against a prosecutor, on his own initiative, inviting the jury to draw

an adverse inference from silence, but distinguished *Griffin* as follows:

It is one thing to hold, as we did in *Griffin*, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence. There may be some "cost" to the defendant in having remained silent in each situation, but we decline to expand *Griffin* to preclude a fair response by the prosecutor in situations such as the present one.

*DiNicola, supra* at 560–61, 866 A.2d at 335–36 (internal citations omitted).

¶ 19 Additionally, this Court has stated:

One who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of that opening. The phrase "opening the door"... by cross examination involves a waiver. If [an appellant] delves into what would be objectionable testimony on the part of the Commonwealth, then the Commonwealth can probe further into the objectionable area.

*Commonwealth v. Stakley,* 243 Pa.Super. 426, 365 A.2d 1298, 1299–1300 (1976). *See also Commonwealth v. Patosky,* 440 Pa.Super. 535, 656 A.2d 499, 504 (1995), *appeal denied,* 542 Pa. 664, 668 A.2d 1128 (1995) (holding when defendant delves into what would have been objectionable testimony on Commonwealth's part, Commonwealth can probe into objectionable area); *Commonwealth v. Bey,* 294 Pa.Super. 229, 439 A.2d 1175, 1178 (1982) (holding where defendant opens door to what otherwise might be objectionable testimony, Com-

monwealth may probe further to determine veracity of statement).

¶ 20 Instantly, the Commonwealth called Officer Cyprian Scott to testify during its case-in-chief. During the defense's cross examination, the following exchange took place:

[COUNSEL]: And my client, [Appellant], when you questioned him, he didn't say, wait a minute, I need a lawyer, I want to take the Fifth. He didn't do any of that, right?

[WITNESS]: That's correct.

[COUNSEL]: He answered every one of your questions that you had for him, right?

[WITNESS]: I only asked him one, Counselor.

[COUNSEL]: You only asked him one, but whatever you asked him, he answered freely and voluntarily, correct?

[WITNESS]: That's correct.

(N.T. Trial, 1/22/04, at 191). On re-direct examination, the prosecutor also explored the topic of Appellant's post-arrest statements to the police:

[PROSECUTOR]: I just have some questions that are very, very, very specific to some of the cross examination, very specific. [Defense counsel] asked you specifically did you hear [Appellant] plead the fifth and you said no.

[WITNESS]: That's correct.

[PROSECUTOR]: Did you hear him say, I want a lawyer, and you said no?

[WITNESS]: That's correct.

[PROSECUTOR]: Were you present when he was being processed down at the Police Administration Building?

[WITNESS]: No, I was not.

[PROSECUTOR]: Were you present when detectives asked him whether he wanted to make any kind of a statement?

[WITNESS]: No, I was not.

(*Id.* at 197–98). After Officer Scott's response, defense counsel immediately objected to the prosecutor's line of questioning because it exceeded the scope of Officer Scott's prior testimony. The trial court sustained defense counsel's objection, and instructed the jury that a defendant has an absolute right to remain silent. (*Id.* at 198).

¶ 21 During the prosecutor's closing statement, he referenced certain pre-arrest statements Appellant had made to police:

> I wonder why [Appellant] needed three gloves that night, and I guess if you're caught on tape yellow-hoodied [sic] red handed with shots still echoing through the night and your friend, your friend is still bleeding out of fourteen holes...and you're doing nothing more than whistling and saying nothing more than I don't know, I was just running, why are you stopping me, then maybe you start your opening statements with [Decedent] was not a very important person.

(N.T. Trial, 1/27/04, at 47). Defense counsel objected to this portion of the prosecutor's argument, but the court overruled the objection. (*Id.* at 47–48).

¶ 22 Here, defense counsel briefly cross-examined Officer Scott about Appellant's cooperation in terms of Appellant's failure to request an attorney or plead the Fifth Amendment. (N.T. Trial, 1/22/04, at 191). On re-direct examination, the prosecutor then questioned whether Officer Scott had been present during all of Appellant's processing or interrogation, in an effort to clarify the extent of the officer's knowledge. Defense counsel objected. However, defense counsel's questions on cross-examination had opened the door to this inquiry. *See Patosky, supra; Bey, supra; Stakley, supra.* The prosecutor's re-direct

examination of Officer Scott constituted permissible fair response to the topics raised during defense counsel's cross-examination. *See id.* Additionally, the trial court immediately issued a curative instruction concerning Appellant's absolute right to remain silent, which we can presume the jury followed. *See Melendez–Rodriguez, supra* (stating law presumes jury will follow instructions of court).

¶ 23 Regarding the Commonwealth's closing argument, the prosecutor referenced statements Appellant first made when police stopped him on the night of the murder. The prosecutor did not refer to Appellant's right to remain silent. Thus, the prosecutor's reference "does not establish innate prejudice." *See DiNicola, supra. See also Commonwealth v. Bracey,* 831 A.2d 678 (Pa.Super.2003), *appeal denied,* 577 Pa. 685, 844 A.2d 551 (2004) (holding prosecutor's passing reference to progression of defendant's "story" was merely fair comment and not impermissible reference to defendant's pre-arrest silence). The trial court also interrupted the prosecutor's closing argument to instruct the jury that the prosecutor's comments were not evidence. (N.T. Trial, 1/27/04, at 87). Again, we can presume the jury followed this instruction. *See Melendez–Rodriguez, supra.* Accordingly, Appellant's issues concerning the Commonwealth's alleged references to Appellant's right to remain silent warrant no relief. *See DeJesus, supra.*

■ ¶ 24 Appellant also claims that the prosecutor misinformed the jury about retribution as a potential motive for Appellant to murder Decedent. Initially, we must examine the context of the prosecutor's impulsive remark. On January 21, 2004, the Commonwealth called Decedent's brother, Curtis Brown, as a witness. On re-cross examination, the following exchange occurred:

[DEFENSE COUNSEL]: It's correct to tell the jury that about a week before your brother was taken in to Homicide concerning the shooting of Jody, a fella by the name of Jody; is that correct?

[COMMONWEALTH]: Judge, I have to object.

THE COURT: Sustained.

[COMMONWEALTH]: [Appellant's] first cousin Jody Satchell?

(N.T. Trial, 1/21/04, at 57).

¶ 25 The trial court immediately ordered the jury to exit the courtroom. The court proceeded to entertain an argument from defense counsel about the impropriety of the prosecutor's comment. Defense counsel maintained Jody Satchell was not related to Appellant. Defense counsel also asked the court to tell the jury that the prosecutor's comments "are not evidence and disregard them." (*Id.* at 60). When the jury re-entered, the court issued the following instruction: "[T]he comments of lawyers are not evidence in the case. The only . . . evidence is what the witnesses say or . . . the physical objects that are admitted into evidence, so please disregard any comments lawyers make." (*Id.* at 62–63).

¶ 26 Here, the prosecutor made a passing comment as a direct result of a line of questioning initiated by defense counsel. After this single comment, the prosecutor did not further elaborate on any suggested relationship between Appellant and Jody Satchell. Instead, the court sent the jury out and admonished the prosecutor for his poor judgment. When the jury returned, the court issued the exact curative instruction that defense counsel had requested.

At the very most, the prosecutor's comment had minimal effect on the jury and did not deny Appellant a fair trial. *See DeJesus, supra.* Moreover, we presume the jury followed the court's instruction concerning comments made by counsel. *See Melendez–Rodriguez, supra.* Accordingly, this issue merits no relief.

■ ¶ 27 The trial court addressed Appellant's remaining prosecutorial misconduct issues in its Rule 1925(a) opinion as follows:

[Appellant] contends that the prosecutor erred in allegedly making unsubstantiated statements regarding his personal opinions as to the guilt of [Appellant]. However, [Appellant] cites to the prosecutor's comments in closing argument regarding the videotape of the murder which was introduced as evidence at trial. As a prosecutor is free to comment on evidence during closing and draw general inferences arising from that evidence, this claim is meritless.

Furthermore, [the trial] court instructed the jury in its opening instructions: "Statements that the lawyers make are not evidence. Opening arguments are not evidence. **Closing arguments are not evidence.**" As the jury is presumed to follow instructions, this claim is without merit.

[Appellant] next claims that the prosecutor's comments regarding defense counsel during the prosecutor's closing constituted reversible error. Although the prosecutor's comments were childish and unnecessary, they did not undermine the trial process.[6] As already dis-

* * *

Based on this evidence, [Appellant] was [Decedent's] judge, jury and executioner. On what? On a rumor. On BS. That's all he wanted to hear, just like that's all [Appellant] wanted to hear, that's all [defense counsel] wanted you to hear.

---

**6.** The comments from the prosecutor's closing argument which Appellant now complains about are:

I can understand why [defense counsel] doesn't want you to look, why he doesn't want you to see, but you use your eyes and your common sense. . . .

cussed, a prosecutor is permitted fairly wide latitude in advocating for the Commonwealth, including the right to argue all fair conclusions from the evidence, to respond to defense arguments, and to engage in a certain degree of oratorical flair.

(Trial Court Opinion at 14–16) (emphasis in original) (internal citations omitted). As the trial court emphasizes, the prosecutor's comments did not constitute reversible error, because the comments concerned evidence already on the record and constituted oratorical flair. *See Fletcher, supra; DeJesus, supra.* Additionally, the court's cautionary instructions muted any possible undue prejudice. *See Baez, supra.* Accordingly, we dismiss Appellant's claims of prosecutorial misconduct. *See DeJesus, supra.*

■■■ ¶ 28 In his third issue, Appellant contends the Commonwealth withheld evidence of fingerprint lifts taken from the murder weapon, which had been processed under the name "Clarence Brooks."[7] Appellant insists the Commonwealth did not produce these fingerprint lifts until the middle of the trial, thus depriving Appellant of the opportunity "to examine Clarence Brooks' criminal file and [to] undertake investigative actions to disprove the use of an alias and refute the argument that was advanced by the prosecutor." (Appellant's Brief at 17). Further, Appellant argues "the existence of another person named Clarence Brooks, raises an entire line of questions concerning whether there was a person other than [Appellant] who was culpable." (*Id.* at 18). Appellant concludes the Commonwealth committed a bad faith violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), ignored Pennsylvania Rule of Criminal Procedure 573, and this Court must overturn his conviction. "Absent bad faith, a new trial would be warranted." (Appellant's Brief at 29). We disagree.

¶ 29 Pennsylvania Rule of Criminal Procedure 573 governs pretrial discovery as follows:

> *Rule 573. Pretrial Discovery and Inspection*
>
> \* \* \*
>
> **(B) Disclosure by the Commonwealth**
>
> *(1) Mandatory:* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>
> \* \* \*
>
> (f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence;
>
> \* \* \*

Pa.R.Crim.P. 573(B)(1)(f).

¶ 30 In *Brady,* the United States Supreme Court held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process

---

\* \* \*

I'm just asking you to recollect what happened when you all went in the back and [defense counsel] had said I don't want to hear the rest of that answer, Detective Kane.

(N.T. Trial, 1/27/04, at 57, 84, 85).

7. Testimony at trial revealed the name "Mr. Brooks" was an alias that Appellant had used. (N.T. Trial, 1/23/04, at 183).

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, supra* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. In sum, there are three necessary components to demonstrate a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Commonwealth v. Causey*, 833 A.2d 165, 170 (Pa.Super.2003), *appeal denied*, 577 Pa. 732, 848 A.2d 927 (2004).

> [E]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. As *Brady* and its progeny dictate, when the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted.

*Id.* (internal citations and quotation marks omitted).

¶ 31 Instantly, the Commonwealth called William Whitehouse, a criminal evidence specialist for the Philadelphia Police Department, to testify about his observations of the crime scene. On cross examination, defense counsel first mentioned the fingerprint lifts, listed under the name of Clarence Brooks, and questioned Mr. Whitehouse about whether these fingerprints had been evaluated. (N.T. Trial, 1/23/04, at 58). Significantly, Mr. Whitehouse tes-

tified that the fingerprint lifts in question "did not have sufficient detail to be compared to anybody at all. [It] could not be determined who left these latent prints." (*Id.*) Because these fingerprint lifts did not have "sufficient detail" for any relevant analysis, this evidence was not exculpatory. Therefore, the fingerprint lifts could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See Causey, supra.* Accordingly, this issue warrants no relief.

¶ 32 In his final issue, Appellant argues the surveillance videotape, introduced as part of the Commonwealth's case, contained indiscernible images of a person running in the vicinity of 53rd Street and Woodland Avenue. "Even though it was not possible to make out the physical features of the assailant on the nighttime images that were depicted in the tape, the prosecutor was allowed to use it as a means of buttressing the testimony of the [arresting police officers]." (Appellant's Brief at 26). Appellant insists the trial court needed to provide the jury with an instruction pursuant to *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954), because the use of an unreliable source as the basis for identification warrants a cautionary instruction.[8] Appellant concludes the trial court erred in denying a *Kloiber* instruction, and he deserves a new trial as a result. We disagree.

¶ 33 "A *Kloiber* charge instructs the jury that an eyewitness' identification should be viewed with caution where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defen-

---

8. Appellant requested a *Kloiber* instruction on January 27, 2004, prior to the court's issu-

ance of its jury charge. (N.T. Trial, 1/27/04, at 94–95).

dant; or (3) had a problem making an identification in the past." *Commonwealth v. Upshur*, 764 A.2d 69, 77 (Pa.Super.2000), *appeal dismissed as improvidently granted*, 566 Pa. 589, 782 A.2d 538 (2001) (internal quotation marks omitted). "However, identification testimony need not be received with caution where it is positive, unshaken, and not weakened by a prior failure to identify." *Id.*

¶ 34 Additionally, Pennsylvania Rule of Evidence 901 governs the authentication of evidence:

**Rule 901. Requirement of authentication or identification**

(a) **General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) *Testimony of witness with knowledge.* Testimony that a matter is what it is claimed to be.

\* \* \*

Pa.R.E. 901.

¶ 35 Instantly, the jury viewed the surveillance videotape. As the trial court noted:

In viewing this tape, the jury was in an adequate position to determine whether the video image of [Appellant] was unrecognizable. Moreover, as the video was shown to the jury rather than the jury hearing uncertain witness testimony regarding identification, the harm that the *Kloiber* instruction tries to cure is inapplicable in the present situation. Therefore, there was no reason for this court to instruct the jury to view this video with caution.

Additionally, Officers Gallen–Ruiz and Rutter testified extensively to the identification of [Appellant]. In fact, Officer Rutter testified that he only glanced away from [Appellant] for a split second when he noticed a body down. He then never lost sight of [Appellant] from the time the officers proceeded south on 53rd Street until the time [Appellant] was apprehended. Officer Gallen–Ruiz further stated that there was no question in her mind that she never lost sight of [Appellant]. Moreover, Officer Gallen–Ruiz testified as to the contents of the videotape. Therefore, there was absolutely no reason for this court to caution the jury, as the identification of [Appellant] was unequivocal due to the video and the unwavering testimony of the police officers.

(Trial Court Opinion at 10) (internal citations omitted). We accept the trial court's reasoning. Officer Gallen–Ruiz authenticated the contents of the videotape, and the trial court properly admitted the tape into evidence. *See* Pa.R.E. 901(b)(1). We agree a *Kloiber* instruction was not necessary in the instant case. *See Upshur*, *supra*.

¶ 36 Based upon the forgoing, we hold the trial court correctly decided to allow evidence of Appellant's prior *crimen falsi* convictions, if Appellant took the stand in his own defense at trial; Appellant is not entitled to a new trial on his claims of prosecutorial misconduct; and, a cautionary instruction with regard to the videotape was not necessary in the instant case. Accordingly, we affirm the judgment of sentence.

¶ 37 Judgment of sentence affirmed.