J-A15009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                         :               PENNSYLVANIA
                                         :

               v.                        :

                                         :

BRAHEEM MORGAN                   :
                                         :

            Appellant          :           No. 1490 EDA 2019

Appeal from the Judgment of Sentence Entered April 29, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002901-2018

BEFORE:   LAZARUS, J., KING, J., and STRASSBURGER, J.[*]

MEMORANDUM BY KING, J.:            **FILED AUGUST 28, 2020**

Appellant, Braheem Morgan, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for first-degree murder, arson, causing a catastrophe, and possession of an instrument of crime ("PIC").[1]  We affirm.

The relevant facts and procedural history of this case are as follows:

> On November 21, 2017, at approximately 12:21 am, a fire erupted in an abandoned building located on the corner of 60th and Locusts Streets.  [Appellant] intentionally started the fire that engulfed two abandoned buildings located at 235 and 237 South 60th Street, killing Clifton Sanders, (["Victim"]), who was sleeping inside 235 South 60th Street, where the fire initially started.
>
> [On March 1, 2018, law enforcement arrested Appellant and charged him with first degree murder, arson, causing a

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 3301(a)(1)(i), 3302(a), and 907(a), respectively.

catastrophe, criminal mischief, PIC, and recklessly endangering another person. Appellant proceeded to a five-day jury trial on April 22-26, 2019.] Police Officer Sweeney, from the 18th District, testified that on November 21, 2017, at approximately 8:30 am, he was assigned to secure a fire scene that was a collapse hazard at 235-237 South 60th Street. At approximately 1:20 pm, Officer Sweeney entered the property of 235 through a hole in the brick wall at the rear of the building. Upon looking up to a second-floor loft, he observed a white skull that appeared to be a body. He notified the office of the Fire Marshal.

Fire Marshal, Lieutenant Charles Grover, testified that on November 21, 2017, at approximately 2:48 pm, he responded to a call reporting that a body was found inside of an abandoned building after a fire. Lt. Grover arrived on scene and inspected the buildings involved in the fire. He determined that the origin of the fire was on the first floor of 235 South 60th Street, in the rear. This was based on the heavy fire damage in that area. He explained that the area with the most fire damage is the area where the fire starts because it burns there the longest. Furthermore, he viewed a video of the fire, and was able to determine based on the progression of the fire, the speed of the fire, the flash of the flames, and the direction in which it moved, that the fire was caused by an open flame being applied to an ignitable liquid. He was unable to do a full investigation due to the imminent danger of collapse, but was able to eliminate electricity, gas, cigarettes, and anything that would ignite as a slow burn as a cause of the fire. He concluded that this was an incendiary fire, meaning it was intentionally set.

A series of videos of the fire were shown to the jury…. While on the scene, Lieutenant Grover came into contact with Richard Williams, a friend of [Victim]. Mr. Williams reported to the Lieutenant that a male had been looking for [Victim] on the evening of the fire claiming that [Victim] owed him money for drugs. At that time, the male threatened to kill [Victim] and "burn that M.F.er down." Mr. Williams described the male as slim with brown skin, 5'8" or 5'9" weighing about 140 pounds.

Richard Williams testified that he has known [Victim] for over forty (40) years, and that [Victim] was like a brother

to him. He confirmed that [Victim] slept in the abandoned building located at 235 South 60th Street, and that there was a male looking for [Victim] on the night of the fire.

At trial, [Mr.] Williams testified that he had memory issues arising from his history of alcohol abuse and that he did not want to be involved in the case. He was then impeached with his statement to police, given on November 23, 2017, wherein he identified [Appellant] in a photo array and stated, that on the night of the fire, [Appellant] told him that [Victim] did not pay [Appellant] money that he owed him. [Appellant] stated "I am going to kill that n*gga. I am going to burn his building down."

James "Bo-Peep" Harrington testified that [Victim] was his friend whom he had known for over ten years. The two would spend time together at the corner of 60th and Locust, outside of the S&K Beers deli (hereafter referred to as deli) located at that corner. [Victim] lived in the abandoned building located across the street at 235 S. 60th Street and slept on the second floor. On the night of the incident, [Mr.] Harrington heard an argument between [Victim] and another male. The two were located inside of 235 S. 60th Street so [Mr.] Harrington was unable to see anyone; he could only hear voices. Additionally, [Mr.] Harrington identified a photo of [Appellant] as the male that had been looking for [Victim] on the night of the fire. At approximately 12:20 am, [Mr.] Harrington saw flames and reported the fire.

Tyrone Cooley testified that he had seen [Victim] around the neighborhood for about twenty years prior to the fire. He stated that it was common knowledge throughout the neighborhood that [Victim] slept in the abandoned building located at 235 S. 60th Street. Mr. Cooley lived across the street from the building at 226 S. 60th Street. Mr. Cooley heard arguing coming from 235 S. 60th Street earlier on the evening of the fire. He heard [Victim]'s voice, along with a younger male voice shouting from inside the building. Mr. Cooley is depicted in the video, standing outside of the deli prior to the fire. Mr. Cooley testified that he is not in the habit of looking at people's faces, so he was unable to identify [Appellant] in the video. However, in his statement to detectives, he identified a photo of [Appellant] as

- 3 -

someone that he saw around the neighborhood often.

Yasmen "Pooda" Wong, a sex worker in the area, testified that she had known [Victim] for a few years from hanging around the neighborhood. [Victim] lived in the abandoned building located at 60th and Locust. Ms. Wong identified [Appellant] as the male that had approached her at the deli across the street from 235 S. 60th Street on the evening of the fire and inquired about the location of [Victim]. Ms. Wong told [Appellant] that [Victim] stayed at 235 S. 60th Street. [Appellant] asked how to get into the building, and she told him that there was a hole in the rear of the building. After receiving this information, [Appellant] handed Ms. Wong a dime bag of crack cocaine and walked toward 235 S. 60th Street. Ms. Wong saw [Appellant] return to the deli, approximately ten (10) minutes later wearing a different colored hoodie from when she had spoken to him ten (10) minutes earlier. Ms. Wong identified [Appellant] in the videos.

During cross-examination, Ms. Wong testified that [Appellant]'s stepfather, Kenneth Graham, was on the corner of 60th and Locust earlier on the night of the incident, selling drugs and that she regularly saw [Victim] buying drugs from Mr. Graham.

Detective Lucke testified that he recovered and compiled the video evidence in this case from two cameras on the premises of the deli, located at 241 S. 60th Street and from a day care center located at 238-240 S. 60th Street. The cameras from the interior and exterior of the deli depict a male in a gray hoodie, black ski mask,[7] black pants, and black shoes stop outside of the deli and speak to Ms. Wong. He then walks off screen. Approximately two minutes later, the male returns and walks into the store for approximately one (1) minute, then has a conversation with Ms. Wong at the entrance. One minute after this conversation, the male pulls down the mask, exposing the lower portion of his face. The male is next seen walking across the street toward 235 S. 60th Street. He then returns to the deli a third time, with the mask still partially covering the bottom portion of his face. Once inside, the male has another conversation with Ms. Wong, then exits the store walking towards 235 S. 60th Street. This entire portion of the video is recorded

approximately one hour prior to the fire.

> [7] [Appellant] was wearing a bandana style of ski mask which covered only the bottom portion of his face.

Approximately fifteen minutes prior to the fire, the video depicts a male wearing a black jacket, blue hoodie, black ski mask, black pants, and black shoes, carrying a black duffel bag, walking by the front of the deli. He crosses the street, then returns to the deli, speaks with Ms. Wong, and enters the deli. The camera was able to capture a full body image of the individual in the blue hoodie. Detective Lucke did a side-by-side comparison of the male with the earlier video of the male, who was wearing the gray hoodie. Both males are wearing pants and shoes with the same logo in the same location and the face mask appears to be the same.[8] The male enters the deli for a few minutes and leaves at 12:14:40 am. The video shows him having another short conversation with Ms. Wong.

> [8] Ms. Wong identified [Appellant] as both the male in the blue hoodie and the male in the gray hoodie.

The next portion of the surveillance footage is taken from a childcare facility located at 238-240 S. 60th Street. The video captures the male walk from the deli and cross the street towards 235 S. 60th Street. Detective Lucke prepared a side-by-side comparison of the footage from the deli and the footage from the childcare facility, allowing the view to be able to follow [Appellant] from the deli across the street, towards 235 S. 60th Street. This occurs at approximately 12:15 am on November 21, 2017. At 12:22 am (17:54 into the video), a flash of light can be seen in the top left corner of the screen.

Officer Kevin Creeley, from the 24th Police District, testified that on November 20th, 2017, he executed a pedestrian stop of [Appellant] after observing him urinating on the 4000 block of Maywood Street in Kensington, almost ten miles from 60th and Locust. This occurred at 8:15-8:56 pm. Officer Creeley observed that [Appellant] was wearing a ski mask. Officer Creeley instructed him to leave the area.

Dr. Wardak, from the Philadelphia Medical Examiner's

Office, testified that the cause of death was smoke inhalation and the manner of death was homicide. He also testified that [Victim] suffered burns on over 80% of his body. [Victim] had an underlying heart disease which lowered his tolerance for smoke inhalation, thus causing [Victim] to succumb more easily to smoke inhalation. Dr. Wardak found that [Victim]'s blood alcohol level was twice the legal limit and that there were 200 micrograms per liter of cocaine in [Victim]'s system.

The Defense presented Jamillah Poston, [Appellant]'s mother. Ms. Poston testified that Mr. Graham, her ex-husband and [Appellant]'s stepfather, told her that he started the fire. She testified that [Appellant] visited her at her house in Irving Street the evening of the fire. She viewed the video evidence and identified [Appellant] as the individual with the gray hoodie and ski mask. However, she identified the male with the blue hoodie and ski mask in the video as her ex-husband, Kenneth Graham, rather than [Appellant]. She attempted to distinguish one from the other by their gait.

[Appellant] testified that on the night of the incident, he left his girlfriend's house at 3902 Dungan St., in the Juniata section of the city, to go to the corner of 60th and Locust to sell drugs. He was stopped in Juniata by Officer Creeley for urinating on the highway, and then released. He then stopped by his mother's house at 5930 Irving St., which is around the corner from 60th and Locust, briefly, before going to 60th and Locust, where he began selling drugs. While out on the corner of 60th and Locust, he saw his stepfather, Kenneth Graham. [Appellant] identified himself on video as wearing the grey hoodie and ski mask and his stepfather as wearing the blue hoodie and ski mask. [Appellant] walked behind 235 S. 60th Street at approximately 11:00 pm, to urinate. [Appellant] then walked up and down 60th Street from Spruce St. to Locust St., leaving the area at approximately 12:24 am.

[Appellant] testified that he sold drugs, but never to [Victim]. [Appellant] did not know [Victim] personally, but had seen him a few times around the neighborhood. [Victim] did not owe [Appellant] any money and [Appellant] was never looking for [Victim]. [Appellant] saw his

stepfather in February of 2018, and his stepfather told him not to worry about the legal repercussions of the fire because his stepfather started the fire.

Detective Dunlap, from the Homicide Division, testified that he has specialized training in Historical Cellular Site Analysis. Detective Dunlap analyzed the cell phone records for a Sprint cellular device…which was registered to [Appellant]. Detective Dunlap found that the device was located in Juniata, in the vicinity of 4000 Maywood St., at approximately 8:56 pm, on the evening of the incident, which corroborated the location of [Appellant] during the pedestrian stop carried out by Officer Creeley. Furthermore, from 10:30 pm to 12:24 [am] the cell phone registered to [Appellant] was utilizing a cell phone tower located at 6232 Walnut Street, near the area of the crime scene. At 12:24 am, that same phone called a taxi service company…from the area of the crime scene, approximately one minute before the 911 call was placed, reporting the fire. The phone then utilized towers heading north, away from the crime scene. The device was disconnected on [November 24, 2017].

Detective Dunlap testified that there are major investigative limitations to tracking cell phones, the most restrictive of which include the inability to know who had the phone in question at what time, and the exact location of the phone at any given time.

(Trial Court Opinion, filed August 23, 2019, at 2-9) (internal citations and some footnotes omitted).

During closing arguments, defense counsel suggested that Appellant's stepfather, Mr. Graham, was the perpetrator, arguing that the jury should have a reasonable doubt as to who committed the crimes. In response, the prosecutor stated:

…It doesn't seem to make a whole lot of sense, and that is because this ain't a mystery, folks. In all seriousness, this was a really horrible, horrible thing and I can't believe we

- 7 -

are seriously having any degree of conversation about that being accepted because it's not about being the bad stepdad. It's not. It's [Appellant], and he killed [Victim].

(*See* N.T. Trial, 4/26/19, at 94-95). Defense counsel objected and moved for a mistrial, alleging the prosecutor's closing argument improperly expressed a personal opinion regarding Appellant's guilt. The trial court overruled the objection and denied Appellant's request for a mistrial. (*Id.* at 95).

Following deliberation, the jury convicted Appellant on April 29, 2019, of first-degree murder, arson, causing a catastrophe, and PIC. On the same day, the trial court sentenced Appellant to life imprisonment without parole for the first-degree murder conviction and imposed no further penalty for the remaining offenses. On May 2, 2019, Appellant timely filed a post-sentence motion, which the court denied on May 14, 2019.

Appellant timely filed a notice of appeal on May 20, 2019. The following day, the court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). On May 30, 2019, Appellant timely filed a Rule 1925(b) statement, along with a motion for an extension of time to file an amended statement. The court granted the motion for an extension, allowing Appellant to file a supplemental statement within 30 days of receiving the notes of testimony. On July 24, 2019, the notes of testimony became available, and on August 15, 2019, Appellant timely filed an amended Rule 1925(b) statement.

On appeal, Appellant raises three issues:

Were the convictions for Murder of the First Degree (18 Pa.C.S.A. [§] 2502), Arson (Death) [18 Pa.C.S.A. § 3301(a)(1)(i)], Causing or Riskin[g] a Catastrophe [18 Pa.C.S.A. § 3302(a)] and [PIC] (18 Pa.C.S.A. [§] 907), not supported by sufficient evidence? Was the evidence presented so speculative, contradictory and inconsistent that the verdicts were not supported by sufficient evidence?

Were the convictions for Murder of the First Degree (18 Pa.C.S.A. [§] 2502), Arson (Death) [18 Pa.C.S.A. § 3301(a)(1)(i)], Causing or Risking a Catastrophe [18 Pa.C.S.A. § 3302(a)] and [PIC] (18 Pa.C.S.A. [§] 907) against the weight of the evidence? Were certain facts so clearly of greater weight that to ignore them or to give them equal weight with all the facts was to deny justice? Should this verdict shock one's sense of justice due to the contradictory, speculative and inconsistent evidence?

Did the Assistant District Attorney err in his closing speech to the jury by giving his statement of personal opinion that it was [Appellant], not his stepfather, who killed [Victim] (4/26 N.T. 95)? Did the trial judge err in not granting the requested mistrial?

(Appellant's Brief at 6-7).

In his first and second issues, Appellant argues the Commonwealth failed to present sufficient evidence at trial to prove Appellant committed the offenses and contends that the jury's verdict was against the weight of the evidence. Appellant alleges the evidence fails to show that he set the fire to the abandoned building or that he had any motive to kill Victim. Rather, Appellant maintains the evidence showed his stepfather, who regularly sold drugs to Victim, was the perpetrator.

Appellant also challenges the credibility of the Commonwealth's witnesses, highlighting their drug and alcohol abuse and their inconsistent

- 9 -

testimony, and Appellant maintains that none of the witnesses testified that they saw Appellant light the fire. Appellant claims the witnesses' behavior surrounding this incident (*i.e.*, failing to check on Victim when they heard an argument in the abandoned building, failing to tell the firefighters that Victim lived in the burning building, and failing to provide statements to police until months after the fire, etc.) further undermines their credibility. Appellant avers the testimony of the Commonwealth's witnesses was so contradictory and uncorroborated that the jury's guilty verdict was based purely on speculation and conjecture. Appellant concludes he is entitled to relief on his challenges to the sufficiency and/or weight of the evidence. We disagree.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses

and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super. 2005)). Challenges to witness credibility generally implicate the weight, not the sufficiency, of the evidence. *See Commonwealth v. Price*, 616 A.2d 681, 683 (Pa.Super. 1992) (explaining sufficiency challenge asks whether evidence exists on record to support conviction, whereas argument that witness' account is not credible goes to weight). Nevertheless,

> [I]n those extreme situations where witness testimony is so inherently unreliable and contradictory that it makes the jury's choice to believe that evidence an exercise of pure conjecture, any conviction based on that evidence may be reversed on the grounds of evidentiary insufficiency, since no reasonable jury could rely on such evidence to find all of the essential elements of the crime proven beyond a reasonable doubt.

*Commonwealth v. Brown*, 617 Pa. 107, 136 n.18, 52 A.3d 1139, 1156 n.18 (2012).

The following principles apply to our review of a weight of the evidence claim:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the…verdict if it is so contrary to the evidence as to shock one's sense of justice.

- 11 -

> ***Commonwealth v. Small***, 559 Pa. 423, [435,] 741 A.2d 666, 672-73 (1999). Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Champney***, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (most internal citations omitted).

The Pennsylvania Crimes Code defines first-degree murder as follows:

> **§ 2502. Murder**
>
> **(a) Murder of the first degree.—** A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2502(a).

> To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he…unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner.
>
> > It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. …
>
> The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

***Commonwealth v. Schoff***, 911 A.2d 147, 159-60 (Pa.Super. 2006) (internal citations omitted).

The Crimes Code defines arson in relevant part as follows:

> **§ 3301. Arson and related offenses**

**(a) Arson endangering persons.**—

(1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:

> (i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire….

18 Pa.C.S.A. § 3301(a)(1)(i).  The Crimes Code defines causing a catastrophe as follows:

**§ 3302.  Causing or risking catastrophe**

**(a) Causing catastrophe.**—A person who causes a catastrophe by explosion, fire, flood, avalanche, collapse of building, release of poison gas, radioactive material or other harmful or destructive force or substance, or by any other means of causing potentially widespread injury or damage, including selling, dealing in or otherwise providing licenses or permits to transport hazardous materials in violation of 75 Pa.C.S. Ch. 83 (relating to hazardous materials transportation), commits a felony of the first degree if he does so intentionally or knowingly, or a felony of the second degree if he does so recklessly.

18 Pa.C.S.A. § 3302(a).  Lastly, Section 907 defines PIC as follows:

**§ 907.  Possessing instruments of crime**

**(a) Criminal instruments generally.**—A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

18 Pa.C.S.A. § 907(a).

Instantly, the Commonwealth presented, *inter alia*: (1) testimony from

the fire marshal that the fire was intentionally set using an ignitable liquid as an accelerant; (2) testimony from Mr. Williams, Mr. Harrington, and Ms. Wong that Appellant had been looking for Victim on the night of the fire; (3) testimony that on November 23, 2017, Mr. Williams gave a statement to police during which he identified Appellant as the man who had been looking for Victim and claimed that Appellant threatened to kill Victim and burn down Victim's building; (4) testimony from Mr. Harrington, Mr. Cooley, and Ms. Wong describing an argument they heard between Victim and a younger man in the abandoned building prior to the fire; (5) testimony from Ms. Wong that she spoke to Appellant at the deli on the night of the fire and told him where Victim lived, Appellant went behind the abandoned building, Appellant returned to the deli wearing a different color hoodie, and Appellant then went behind the abandoned building for a second time; (6) testimony from the medical examiner confirming the cause of Victim's death was smoke inhalation and the manner of death was homicide; and (7) testimony from Officer Dunlap concerning historical cell site information from Appellant's phone that placed Appellant in the vicinity of the crime scene when the fire occurred and showed that he called for a taxi from that area right before the fire was reported.

The Commonwealth also presented a significant amount of surveillance video footage from the night of the fire, which showed: (1) Appellant interacting with Ms. Wong at the deli; (2) Appellant leaving the deli and later returning to the deli carrying a bag and wearing a different color sweatshirt

- 14 -

(but the same/similar ski mask, pants, and shoes); (3) Appellant leaving the deli and walking toward the abandoned building; and (4) a flash of light coming from the abandoned building around the time the fire was first reported.

Viewed in the light most favorable to the Commonwealth as verdict-winner, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Appellant committed the crimes of first-degree murder, arson, causing a catastrophe, and PIC. **See** 18 Pa.C.S.A. §§ 2502(a), 3301(a)(1)(i), 3302(a), and 907(a); **Hansley, supra**. Regarding Appellant's assertion that the Commonwealth's witnesses' testimony was contradictory and baseless, video surveillance footage from the night of the fire corroborated much of the witnesses' testimony. Additionally, the jury was free to believe all, part, or none of the evidence the witnesses provided. **See id.** Thus, Appellant's sufficiency challenge merits no relief. For similar reasons, we will also not disturb the trial court's denial of Appellant's weight of the evidence challenge. **See Champney, supra**.

In his third issue, Appellant asserts the prosecutor made inappropriate statements to the jury. Specifically, Appellant alleges that in the prosecutor's closing argument, he gave the jury his personal opinion that Appellant, not Appellant's stepfather, killed Victim. Appellant claims these comments prejudiced the jury against him and the trial court erred when it failed to issue a limiting instruction or grant a mistrial. Appellant concludes this Court should

reverse his convictions and grant him a new trial. We disagree.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." ***Commonwealth v. Harris***, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007).

> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.
>
> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [the defendant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments…were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made.

***Id.*** (internal citations omitted). "A prosecutor has great discretion during closing argument. Indeed, closing 'argument' is just that: argument." ***Commonwealth v. Brown***, 911 A.2d 576, 580 (Pa.Super. 2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007). "[T]he prosecutor may comment on the credibility of witnesses. Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor." ***Commonwealth v. Chmiel***, 585 Pa. 547, 620, 889 A.2d 501, 544 (2005), *cert. denied*, 549 U.S. 848, 127 S.Ct. 101, 166 L.Ed.2d 82 (2009) (internal citations omitted).

Instantly, in his closing argument, defense counsel argued the evidence

presented reasonable doubt as to whether Appellant committed the crimes at issue. Specifically, defense counsel argued Appellant's stepfather perpetrated the crimes. In response, the prosecutor stated: "…it's not about being the bad stepdad. It's not. It's [Appellant], and he killed [Victim]." (*See* N.T. Trial, 4/26/19, at 94-95). The court overruled Appellant's objection and request for a mistrial. (*Id.* at 95).

In its Rule 1925(a) opinion, the trial court explained:

> When the [prosecutor] made this statement, he was making a proper inference based on the evidence he had just spent several minutes arguing. [Appellant's] theory was that he and his stepfather were on the same block, at the same time, wearing nearly identical clothing, yet the two of them were never seen together on video, and it was the stepfather who started the fire. The statements made by the [prosecutor] were a fair response to [Appellant's] theory.

(Trial Court Opinion at 19). We agree with the trial court's analysis. Here, the prosecutor's comments addressed Appellant's credibility and were a proper response to defense counsel's theory that Appellant's stepfather committed the crimes. *See Chmiel, supra*. Thus, Appellant's claim of prosecutorial misconduct warrants no relief.[2] *See Harris, supra*. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

---

[2] With respect to Appellant's specific claim that the court should have issued a limiting instruction, Appellant did not make that request at trial, so this particular claim is waived. *See* Pa.R.A.P. 302(a) (stating issues not raised in trial court are waived and cannot be raised for first time on appeal).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/28/20