J. A16040/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                :             PENNSYLVANIA
               v.                       :
                                                    :
LAMAR P. OGELSBY,                :           No. 749 EDA 2017
                                                    :
               Appellant        :


Appeal from the PCRA Order, February 10, 2017,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0005339-2012


BEFORE: BENDER, P.J.E., LAZARUS, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED SEPTEMBER 10, 2018**

Lamar P. Ogelsby appeals from the February 10, 2017 order denying his

petition for relief filed pursuant to the Post-Conviction Relief Act ("PCRA"),

42 Pa.C.S.A. §§ 9541-9546. After careful review, we affirm.

A prior panel of this court summarized the lengthy factual history of this

case as follows:

> On December 24, 2006, at approximately 3:00 a.m.,
> Officer Tyrone Harding of the Police Department of the
> University of Pennsylvania was patrolling his district
> when he heard gunshots, and then a woman
> screaming. He drove toward the sounds and found
> the woman on the 3900 block of Market Street. The
> woman, Tamia Hill, was standing next to a prone and
> unresponsive male named Robert Rose
> [("the victim")], who was bleeding profusely from a
> wound in his chest. [The victim] was lying in the bike
> lane on the south side of Market Street. [The victim]
> subsequently died from his wounds. Philadelphia
> Police Officer Kenneth Bolton was called to secure the

scene, where he found several shell casings in .45 and 9mm calibers. The casings were on the surface of Market Street. A total of eight .45 ACP fired cartridge casings were found at the scene of the shooting, along with thirteen 9mm Luger fired cartridge casings.

Khalif Hill lived at 3962 Market Street and knew [the victim] through his cousin, Tamia Hill. At the time of the shooting, Tamia Hill lived at 3950 Market Street, across the courtyard from Khalif Hill, and was dating [the victim]. Khalif Hill knew [appellant] as "Kool-Aid." Immediately after the shooting, he came out of his residence and saw Tamia Hill and his cousin Troy Hill standing over [the victim]. He stayed outside for a few minutes, but left when the police and emergency vehicles began to arrive.

Approximately one week later, Khalif Hill was questioned by members of the Homicide Division of the Philadelphia Police Department. He did not give a statement, but on September 30, 2010, almost four years later, he was arrested in connection with narcotics, and was again taken to the Homicide Division, at which time he told the police that he had seen the shooting, and that he had seen the two men who shot [the victim] fleeing the scene. At that time, he told police that two men he knew as Mike and Kool-Aid shot [the victim], and that Mike held a black gun and Kool-Aid held a machine-gun style weapon with two hands. He identified Michael Gibbons and [appellant] as the two shooters. He also said that Troy Hill told him that Mike and Kool-Aid had killed [the victim]. He said that Troy also told him that [the victim] had bought a car from Kool-Aid but the transmission failed, and that because Kool-Aid was unwilling to give [the victim] his money back, he shot him instead. At trial, Khalif said that he had not actually witnessed the shooting or heard the shots and he did not see Mike and Kool-Aid leave the scene, but that otherwise his statement was truthful. He also said that he did not want to testify, and that he was nervous to do so because it could be dangerous.

Khalif Hill was held as a material witness in this case, due to the fact that he had tried to avoid giving testimony at the preliminary hearing and had actively evaded Commonwealth attempts to secure his testimony during the weeks prior to trial. He testified that [appellant's] uncle and another man broke into his house with a gun in the months before trial, robbed him, and asked him why he took the stand. He also testified that Michael Gibbons had encountered him a week before trial in the basement of the Criminal Justice Center and had asked him to change his testimony.

Tamia Hill was dating [the victim] at the time of his death, and she was with him the day that he saw a Pontiac Bonneville for sale and asked [appellant] about the car. [The victim] decided to buy it, so they retrieved $3,500.00 in order to purchase it. Later, when she went with [the victim] to transfer the title, she saw [appellant's] name on the old title. They transferred the title into her name.

On the morning of December 23, 2006, Tamia Hill and [the victim] had discussed the car and the issues that they were having with its performance. Later that evening, she heard [the victim] preparing to leave the house, and [the victim] asked her brother, Troy Hill, to walk out with him because the car was acting up. Shortly thereafter, she heard gunshots and went outside to find [the victim] lying in the street.

After the shooting, Tamia Hill accompanied detectives to the Homicide Division, where she gave a statement. She gave a second statement on February 25, 2007, in which she first mentioned the trouble with the Bonneville. She had never seen the car again after the shooting and she . . . reported it stolen.

Troy Hill, Tamia Hill's brother, had sold drugs for [appellant] in 2007 or 2008. He worked with a runner named Nate, who was responsible for taking daily proceeds to [appellant] or Michael Gibbons. He saw [the victim] outside in the street on the night of the shooting, calling [appellant's] name and complaining

loudly about the Bonneville. He then saw [the victim] approach local drug dealers who were, at that time, working with Nate; [the victim] smacked them several times, reached into their pockets, and took money from them.

Troy Hill knew that [the victim] was high on ecstasy and tried to calm him down, but [the victim] would not be deterred, and after robbing the drug dealers he came back inside the Hill residence and then left again in search of the Bonneville. Hill went with him, but as soon as they went outside he saw [appellant] and Gibbons running toward [the victim]. [Appellant] told Gibbons "hit that nigga," and both of them fired on [the victim]. [The victim] tried to run, but collapsed from his wounds . . . .

Troy Hill did not talk to authorities about what he had seen, because he did not want to endanger his mother, who lived in the housing development at the scene of the shooting. In May of 2009, while he was in federal custody pending trial in two robberies, he spoke with federal prosecutors and an FBI agent. During his proffer, he said he witnessed this murder. At that time, his family had moved and would presumably no longer be in danger were he to say what he had seen. In August of 2009, Hill entered into a plea agreement. He received a twenty-two year sentence . . . .

\* \* \*

Sean Harris lived at the housing development on the 3900 block of Market Street for several months during 2006 and knew [the victim] well enough to say hello to him. He also recognized [appellant], [whom] he knew as Kool-Aid. On the night of the shooting, he was driving his intoxicated friend home in his friend's Dodge Caravan, and he parked it across Market Street from the housing development. As he was opening the door to get out of the Caravan, he heard gunshots. He immediately got back in the Caravan. When he looked out the window, he saw [appellant] shooting at

- 4 -

least ten times at [the victim] with a large black gun, held with both hands.

Harris called 911 immediately. However, because he was scared, he stayed in the Caravan all night. It was cold, and he turned the vehicle on in order to keep warm. At a certain point, it ran out of gasoline, and his friend went to get more. At approximately 7:00 in the morning, he finally emerged from the vehicle.

On December 27, 2006, . . . Harris was approached by an officer from the University of Pennsylvania's Police Department. The officer asked him if he was okay, and he said that he was not, and that he had not slept since he saw [the victim's] murder. When the officer entered Harris' information, he told Harris that there was an outstanding warrant for his arrest, and took him into custody. He was taken to the Homicide Division of the Philadelphia Police Department and interviewed by detectives about the murder.

Initially, Harris told the detectives what happened but identified a different person as the shooter because he was afraid of reprisal if he identified [appellant]. Later, he felt guilty about identifying the wrong person, and in January of 2012, while he was in custody on another matter, he was again taken to talk to detectives about this murder. He explained to them that he did not identify [appellant] in 2006 because he was afraid for his own safety, but that in all other respects, his prior statement was correct. He confirmed that [appellant] is the man he saw shoot [the victim]. The Commonwealth did not offer him anything in consideration for his testimony, though he did testify that he had hoped that the detectives he spoke to would help him with his case.

*Commonwealth v. Oglesby*, 113 A.3d 358 (Pa.Super. 2014) (unpublished

memorandum at 1-3, quoting trial court opinion, 10/29/13 at 2-5, 6-7),

*appeal denied*, 117 A.3d 1281 (Pa. 2015).

The PCRA court set forth the relevant procedural history of this case as follows:

> On June 18, 2013, after a jury trial, [appellant] was convicted of First-Degree Murder and Conspiracy to Commit Murder. This Court immediately imposed the mandatory sentence of life imprisonment without parole for First-Degree Murder, and a concurrent sentence of twenty to forty years for Conspiracy, for a total sentence of life imprisonment without parole. On March 27, 2015, a jury convicted [appellant's] co-defendant Michael Gibbons of First-Degree Murder and Conspiracy to Commit Murder.[Footnote 1]
>
> > [Footnote 1] *See* CP-51-CR-0007309-2013. Gibbons was arrested three months prior to [appellant's] instant trial. The Honorable Lilian Ransom imposed a total sentence of life imprisonment without parole.
>
> [Appellant] appealed and on November 25, 2014, the Superior Court affirmed the judgment of sentence. [*See Commonwealth v. Oglesby*, 113 A.3d 358 (Pa.Super. 2014), *appeal denied*, 117 A.3d 1281 (Pa. 2015).] On July 8, 2015, our Supreme Court denied Allowance of Appeal. [*See id.*]
>
> On April 13, 2016, through retained private counsel, [appellant] filed a timely [PCRA] petition. On June 9, 2016, the Commonwealth filed a response. On October 24, 2016, upon leave from this Court, [appellant] filed an Amended Petition. On November 22 and November 23, 2016, this Court held an evidentiary hearing. On January 13, 2017, [appellant] filed a Memorandum of Law, and the Commonwealth responded on January 26, 2017.
>
> On February 10, 2017, after hearing argument, this Court denied [PCRA] relief. On February 13, 2017, [appellant] appealed and on March 6, 2017, he filed a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

PCRA court opinion, 4/12/17 at 1-2. The PCRA court filed a comprehensive,

20-page Rule 1925(a) opinion on April 12, 2017.

Appellant raises the following multi-layered issues for our review:

I. Where police promised to not charge a cooperating witness for a narcotics violation so long as he gave a statement implicating [a]ppellant in the murder at issue, did the Commonwealth violate ***Brady v. Maryland***[, 373 U.S. 83 (1963)] by failing disclose the explicit non-prosecution deal?

II. Where a cooperating witness shot a defense witness in the same courtyard as the murder in this case and only six months later, did the Commonwealth violate [***Brady***] by suppressing the police investigative file regarding the subsequent shooting?

III. Did the cumulative prejudice from both Commonwealth ***Brady*** violations, which suppressed favorable impeachment evidence and allowed two cooperating witnesses and the prosecutor to mislead the jury with impunity, deprive [a]ppellant of a fair trial?

IV. Was prior counsel ineffective for not objecting to cross-examination of [a]ppellant that improperly painted him as a liar, and for not raising this claim on direct appeal if the issue was preserved?

V. Was prior counsel ineffective for not objecting to the improper bolstering of two cooperating witnesses, and for not raising these claims on direct appeal if the issues were preserved?

VI. Where the prosecutor, in closing argument, referred to existence of studies proving that a Commonwealth witness was telling the truth, which were not in evidence because he made

them up, was prior counsel ineffective for not objecting?

VII. Where the testimony of Waleed Caldwell, who was related to two cooperating witnesses, would have placed a firearm and the victim's car in one of those witness' possession shortly after the murder, and impeached important parts of that witness' testimony, was prior counsel ineffective for not calling this known witness to testify?

VIII. Was prior counsel ineffective for not calling a known fact and alibi witness, Samika Glenn, when [a]ppellant had told police that he was with her in the weeks after the [victim] was killed and testified to the same, which prior counsel knew would happen?

IX. Where prior counsel could not recall when he discovered the undisclosed police investigative file regarding a cooperating witness shooting a defense witness, was he ineffective for not filing a motion to remand if it was discovered while direct appeal was pending?

X. Did the cumulative prejudice from each instance of prior counsel's ineffective assistance establish prejudice?

Appellant's brief at 5-6.

Proper appellate review of a PCRA court's dismissal of a PCRA petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Miller*, 102 A.3d 988, 992 (Pa.Super. 2014) (citation omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." *Commonwealth v. Patterson*, 143 A.3d 394, 397 (Pa.Super. 2016) (citation

omitted). In order to be eligible for PCRA relief, a defendant must plead and prove by a preponderance of the evidence that his conviction or sentence arose from one or more of the errors listed at 42 Pa.C.S.A. § 9543(a)(2). Further, these issues must be neither previously litigated nor waived. 42 Pa.C.S.A. § 9543(a)(3).

## A. *Brady* violation claims

### *Issues I-III*

Appellant first argues that the Commonwealth deliberately concealed evidence from him in violation of **Brady**. Specifically, appellant contends the prosecution committed **Brady** violations by failing to disclose "significant impeachment evidence," namely that: (1) Commonwealth witness Khalif Hill avoided narcotics charges in exchange for his testimony; and (2) Commonwealth witness Troy Hill shot defense witness Khalil Gardner six months after the instant homicide in the identical location. (Appellant's brief at 14-22.) Appellant further avers that the cumulative prejudice from the Commonwealth's **Brady** violations deprived him of a fair trial. (**Id.** at 22-27.)

In **Brady**, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Brady**, 373 U.S. at 87. Thus, "a **Brady** violation only exists when the evidence is material to guilt or punishment, **i.e.**, when there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth v. Tedford*, 960 A.2d 1, 30 (Pa. 2008) (citation, internal quotation marks and footnote omitted); *see also Commonwealth v. Roane*, 142 A.3d 79, 89 (Pa.Super. 2016) (stating, when a *Brady* claim is advanced under the PCRA, an appellant can only obtain relief by establishing that the alleged violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." (citation and internal quotation marks omitted)).

In order to establish the existence of a *Brady* violation, a defendant must demonstrate that: "(1) evidence was suppressed by the prosecution; (2) the evidence, whether exculpatory or impeaching, was favorable to the defendant; and (3) prejudice resulted." *Commonwealth v. Cousar*, 154 A.3d 287, 301 (Pa. 2017) (citation omitted).

> Prejudice is demonstrated where the evidence suppressed is material to guilt or innocence. Further, [f]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Koehler*, 36 A.3d 121, 133 (Pa. 2012) (citations and internal quotation marks omitted).

Upon careful review, we agree with the PCRA court that appellant failed to meet his burden of establishing that the Commonwealth's suppression of

the aforementioned evidence prejudiced him. As the PCRA court properly

concluded in its opinion:

> [appellant] presents no evidence to establish that the prosecutor knew of Khalif Hill's agreement with police at the time of the instant matter, he can only prove that the prosecutor knew of the agreement at the time of [appellant's] co-defendant Michael Gibbons' trial [in 2015]. Moreover, [appellant] cannot demonstrate prejudice. At trial, Khalif Hill recanted his prior statement to police that he observed the shooting, and instead testified that he was asleep at the time of the shooting. [(Notes of testimony, 6/11/13 at 112.)] Evidence of a deal would only serve to impeach the truthfulness of Khalif Hill's police statement, and is thus merely cumulative of his recantation on the stand. The jury considered Khalif Hill's recantation and rejected it.
>
> . . . .
>
> The Commonwealth clearly violated its duty under *Brady* to disclose evidence that Troy Hill was involved in an unrelated shooting. However, [appellant] cannot demonstrate prejudice, as it is unlikely that such information would sway the jury's verdict. [Appellant] presented Gardner himself as a witness, and he testified that Troy Hill shot him in that very same courtyard, and was reluctant to come forward due to threats from the Hill family. [(Notes of testimony, 6/13/13 at 187-197.)] Even if the jury credited this testimony, the fact that Troy Hill shot Gardner does not make it more probable that Troy Hill shot the [victim]. Moreover, Sean Harris testified that he knew both [appellant] and the [victim] and saw [appellant] shoot at the [victim] at least ten times with a large black gun. [(Notes of testimony, 6/10/13 at 192-200.)] Disclosure of an arrest or any other evidence corroborating Gardner's testimony would not have altered the outcome.
>
> . . . .

> . . . . Here, the Commonwealth presented significant evidence from independent witnesses to secure [appellant's] conviction.

PCRA court opinion, 4/12/17 at 15-17 (citation formatting corrected). We find that the record supports the PCRA court's conclusions.

Additionally, we reject appellant's contention that the cumulative prejudice resulting from the Commonwealth's alleged **Brady** violations deprived him of a fair trial. It is well settled that "where a claimant has failed to prove prejudice as the result of any individual errors, he cannot prevail on a cumulative effect claim **unless** he demonstrates how the particular cumulation requires a different analysis." **Commonwealth v. Wright**, 961 A.2d 119, 158 (Pa. 2008) (emphasis added).

> Although cumulative prejudice from individual claims may be properly assessed in the aggregate when the individual claims have failed due to lack of prejudice, nothing in our precedent relieves an appellant who claims cumulative prejudice from setting forth a specific, reasoned, and legally and factually supported argument for the claim.

**Commonwealth v. Hutchinson**, 25 A.3d 277, 319 (Pa. 2011) (citation omitted), **cert. denied**, 566 U.S. 1035 (2012). Appellant has failed to do so in this instance. **See Commonwealth v. Lambert**, 884 A.2d 848, 857 (Pa. 2005) (stating, "[t]he cumulative impact of meritless **Brady** claims cannot be grounds for relief."). Accordingly, appellant's **Brady** claims fail.

Appellant's remaining claims allege the ineffective assistance of counsel. Preliminarily, we note that appellant was represented during both his jury trial

and on direct appeal by Dennis Cogan, Esq. (hereinafter, "trial counsel" or "appellate counsel.") For the ease of our discussion, these claims are addressed in a slightly different order than presented in appellant's brief.

To prevail on a claim of ineffective assistance of counsel under the PCRA, a petitioner must plead and prove by a preponderance of the evidence that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Specifically, a petitioner must establish the following three factors: "first[,] the underlying claim has arguable merit; second, that counsel had no reasonable basis for his action or inaction; and third, that [a]ppellant was prejudiced." **Commonwealth v. Charleston**, 94 A.3d 1012, 1020 (Pa.Super. 2014), **appeal denied**, 104 A.3d 523 (Pa. 2014) (citation omitted). "[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant." **Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa.Super. 2011) (citation omitted), **appeal denied**, 30 A.3d 487 (Pa. 2011).

## B. Ineffective assistance of trial counsel claims

### Issue IV

We begin by addressing appellant's claim that trial counsel was ineffective in failing to object after the Commonwealth cross-examined him about his business practice of falsely characterizing the vehicles he sold as "gifts" in order to avoid paying taxes. (Appellant's brief at 29-36.) Appellant

further avers, albeit parenthetically, that trial counsel should have objected when the Commonwealth referred to this alleged falsehood in its summation. (*Id.* at 30, referencing notes of testimony 6/14/13 at 178-179.) For the following reasons, we disagree.

Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). Evidence of prior bad acts may be admissible, however, "when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." *Commonwealth v. Ross*, 57 A.3d 85, 98 (Pa.Super. 2012) (citations omitted), *appeal denied*, 72 A.3d 603 (Pa. 2013). Prior bad acts evidence "may also be admissible . . . in situations where the bad acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa.Super. 2004) (citation omitted). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." *Ross*, 57 A.3d at 98 (citation omitted).

Here, we find that there is no arguable merit to appellant's ineffectiveness claim. The record reveals that trial counsel did, in fact, object to the Commonwealth's cross-examination of appellant about his false

characterization of vehicle sales as "gifts," and the trial court subsequently overruled trial counsel's objection.  (**See** notes of testimony, 6/13/13 at 275.)

Moreover, we find that trial counsel possessed a reasonable basis not make repeated objections to this particular line of questioning, given that they likely would have been overruled.  The vehicle transaction in this case was clearly relevant because it formed the motive for the murder and was part of the sequence of events that formed the history of this case.  **See Ross**, 57 A.3d at 98; **Melendez-Rodriguez**, 856 A.2d at 1283.  Our supreme court has long recognized that "[c]ross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness' motive for testifying." **Commonwealth v. Chmiel**, 889 A.2d 501, 527 (Pa. 2005) (citation omitted), **certiorari denied**, 549 U.S. 848 (2006).  Courts in this Commonwealth, however, are "not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand . . . ."  **Commonwealth v. Antidormi**, 84 A.3d 736, 752 (Pa.Super. 2014) (citation and internal quotation marks omitted), **appeal denied**, 95 A.3d 275 (Pa. 2014) (citation omitted).  Based on the foregoing, trial counsel cannot be found ineffective for failing to raise or pursue this meritless claim. **See Commonwealth v. Freeland**, 106 A.3d 768, 778 (Pa.Super. 2014) (stating, "it is axiomatic that [trial] counsel will not be considered ineffective for failing to pursue meritless claims." (citation omitted)).

***Issue V***

Appellant next argues that trial counsel was ineffective in failing to object to testimony elicited by the Commonwealth to bolster the credibility of Commonwealth witnesses Troy Hill and Sean Harris. (Appellant's brief at 37.) Specifically, appellant takes issue with Hill's testimony that various inmates had attacked him in prison for cooperating with the Commonwealth in its case against appellant; that he had received offers of money in exchange for not testifying against appellant; and that individuals took photos of him when he testified against appellant at the preliminary hearing. (***Id.***; ***see also*** notes of testimony, 6/12/13 at 58-65.) Appellant also challenges testimony elicited by the Commonwealth that Harris had requested a transfer from his prison cell before testifying against appellant because he feared for his life. (Appellant's brief at 37; ***see also*** notes of testimony, 6/12/13 at 230-233.)

"Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1180 (Pa. 2011) (citation omitted).

> The prosecution may not inject a highly prejudicial personal opinion of [an] appellant's credibility into evidence, thereby clearly and improperly intruding upon the jury's exclusive function of evaluating the credibility of witnesses. However, as long as a prosecutor does not assert his personal opinions, he or she may, within reasonable limits, comment on the credibility of a Commonwealth witness. This is

> especially true when the credibility of the witness has been previously attacked by the defense. This stems from the general principle that the prosecutor is permitted to respond to the arguments of the defense and is free to present his or her case with logical force and vigor.

*Tedford*, 960 A.2d at 31-32 (citations and internal quotation marks omitted).

Instantly, our review of the record reveals that the prosecutor did not improperly vouch for the credibility of Hill or Harris, nor inject a personal opinion on either witness's particular credibility. Rather, as recognized by the PCRA court, "the prosecutor elicited evidence from Hill and Harris to rebut [appellant's] attacks on Hill's delay in identifying [appellant] as the shooter and Harris' deliberate misidentification of [appellant], respectively." (PCRA court opinion, 4/12/17 at 9 (citation to notes of testimony and footnote omitted).) The record further reflects that during the examination of Hill and Harris, trial counsel objected to the Commonwealth's questioning on four separate occasions, and the trial court twice instructed the jury that such evidence was not being offered for the truth of the matter asserted, but to assess the witness' credibility. (*See* notes of testimony, 6/12/13 at 59-62.) "A prosecutor is permitted fairly wide latitude in advocating for the Commonwealth, including the right . . . to respond to defense arguments. . . ." *Commonwealth v. Harris*, 884 A.2d 920, 931 (Pa.Super. 2005), *appeal denied*, 928 A.2d 1289 (Pa. 2007). Accordingly, appellant's trial counsel was not ineffective for failing to object on the basis of this meritless bolstering claim. *See Freeland*, 106 A.3d at 778.

***Issue VI***

Appellant next argues that trial counsel was ineffective in failing to object to various comments the prosecutor made during his closing argument. Specifically, appellant takes issue with the fact that the prosecutor referenced "studies" implying to the jury that Commonwealth witness Troy Hill was telling the truth.   (Appellant's brief at 41.)   The prosecutor made the following comments during his summation:

> Troy Hill, you know, the defense, I heard disparage over and over and over again.  And I'm not asking you to like him.  And, you know, he's in jail for quite some time, quite a substantial period of his life.
>
> And they do studies on lifers in prison, and those are the ones that have lightbulbs go off that say, you know what.  Those are the ones that change.  Those are the ones that say, I'm facing all these years in jail, and, you know, I got nothing to show for it in my life when I meet my maker.

Notes of testimony, 6/14/13 at 143.  Appellant argues that the prosecutor's reference constituted prosecutorial misconduct and his trial counsel's failure to object on this basis entitles him to a new trial.  (Appellant's brief at 43-45.)  We disagree.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion."  ***Harris***, 884 A.2d at 927 (citations omitted).  Not every unwise remark on a prosecutor's part, however, constitutes reversible error.  ***Id.***  "Prosecutorial misconduct occurs when the effect of the prosecutor's comments would be to prejudice the trier of fact,

- 18 -

forming in its mind fixed bias and hostility toward the defendant so that it could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Duffy*, 832 A.2d 1132, 1137 (Pa.Super. 2003), *appeal denied*, 845 A.2d 816 (Pa. 2004).

> Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. Nor may he or she express a personal belief and opinion as to the truth or falsity of evidence of defendant's guilt, including the credibility of a witness.

*Commonwealth v. Chmiel*, 777 A.2d 459, 466 (Pa.Super. 2001), *appeal denied*, 788 A.2d 372 (Pa. 2001), *cert. denied*, 535 U.S. 1059 (2002).

Following our careful review, we conclude that the prosecutor's comments, when read as a whole, did not warrant that a new trial be granted. "[A] prosecutor is permitted fairly wide latitude in advocating for the Commonwealth, including the right to argue all fair conclusions from the evidence, to respond to defense arguments, and to engage in a certain degree of oratorical flair." *Harris*, 884 A.2d at 931. All such comments must be reviewed in the context in which they were made. *Commonwealth v. Robinson*, 877 A.2d 433, 441 (Pa. 2005).

Here, we agree with the PCRA court that the prosecutor's comments were properly made in response to trial counsel's argument that Troy Hill

agreed to testify on behalf of the Commonwealth in exchange for a lenient jail sentence. (*See* notes of testimony, 6/14/13 at 79-80.) The record further reflects that the prosecutor's comments were not the kind of comments that would cause the jury to form a fixed bias or hostility towards appellant and prevent it from properly weighing the evidence and rendering a fair and impartial verdict. As noted, "a prosecutor is permitted fairly wide latitude in advocating for the Commonwealth, including the right . . . to respond to defense arguments. . . ." *Harris*, 884 A.2d at 931. Accordingly, appellant's trial counsel had no basis upon which to object, and appellant's underlying ineffectiveness claim must fail. *See Freeland*, 106 A.3d at 778 (stating, "it is axiomatic that [trial] counsel will not be considered ineffective for failing to pursue meritless claims.").

## *Issues VII-VIII*

We now turn to appellant's claims that trial counsel was ineffective in failing to call a number of witnesses at trial. (*See* appellant's brief at 45-50.) Generally, trial counsel has a duty "to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary." *Commonwealth v. Johnson*, 966 A.2d 523, 535 (Pa. 2009). A claim that counsel was ineffective for failing to investigate or call potential witnesses at trial requires a petitioner to establish that:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense;

and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Matias*, 63 A.3d 807, 810-811 (Pa.Super. 2013) (*en banc*) (citation omitted), *appeal denied*, 74 A.3d 1030 (Pa. 2013). "Counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense." *Id.* at 811 (citation omitted).

Here, appellant first contends that counsel was ineffective in failing to call Waleed Caldwell to testify on his behalf. (Appellant's brief at 45.) Appellant avers that Caldwell's testimony would have refuted the testimony of Commonwealth witness Troy Hill, Caldwell's cousin, and he was prejudiced by trial counsel's failure to introduce his testimony at trial. (*Id.* at 46-47.) For the following reasons, we disagree.

At the PCRA hearing, Caldwell indicated that, had he been afforded the opportunity, he would have testified that he observed Hill driving the victim's vehicle two days after the shooting and that Hill had informed him that he observed the victim get shot but did not identify the two shooters. (Notes of testimony, 11/23/16 at 10-11.) Caldwell also testified that he observed Hill with a semi-automatic pistol after the shooting. (*Id.*)

Counsel, in turn, testified at great length on his strategic decision to forgo calling Caldwell as a witness, based upon his belief that Caldwell was reluctant to testify and that his testimony would not be compelling. (Notes of

testimony, 11/22/16 at 88.) Counsel indicated that Caldwell's testimony would have been cumulative because Khalif Hill had already testified on cross-examination that Troy Hill had driven the victim's vehicle after the shooting. (*Id.* at 88-89.) Counsel further noted that he was concerned that Caldwell would contradict the testimony of Khalif Hill and diminish the strength of their theory that it was Troy Hill who shot the victim. (*Id.*)

"[G]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2012). "If counsel's chosen course had some reasonable basis, the inquiry ends and counsel's assistance is deemed effective." *Commonwealth v. Williams*, 899 A.2d 1060, 1064 (Pa. 2006). Based on the foregoing, we find that trial counsel had a reasonable strategic basis for electing not to call Caldwell as a witness. Accordingly, appellant's ineffectiveness claim must fail. *See Charleston*, 94 A.3d at 1020.

Appellant also contends that counsel was ineffective in failing to call Samika Glenn, appellant's girlfriend and mother of his child, as an alibi witness. (Appellant's brief at 47.) Glenn testified at the November 22, 2016 PCRA hearing that appellant was at home with her on the evening of the shooting and that she recalls his being there "[b]ecause he's always home at night" following the birth of their son. (Notes of testimony, 11/22/16 at 207.)

Appellant avers that introducing Glenn's testimony at trial would have corroborated his own testimony and statements to the police that he was not present at the scene of the shooting and that he was prejudiced by counsel's failure to do so. (Appellant's brief at 48-49.) We disagree.

At the November 22, 2016 hearing, counsel testified at great length with regard to his decision to forgo calling Glenn as an alibi witness, given his concerns that the jury may not perceive her testimony as credible. (*See* notes of testimony, 11/22/16 at 57-60.) The PCRA court, in turn, specifically found Glenn's testimony lacked credibility, noting that "she failed to demonstrate an explicit recollection of the night of the murder; instead she based her testimony on supposition." (PCRA court opinion, 4/12/17 at 13.) It is well established that the PCRA court's credibility determinations are binding on the reviewing court, where, as here, the record supports those determinations. *See Commonwealth v. Jones*, 912 A.2d 268, 293 (Pa. 2006) (stating, "[w]e will not disturb the findings of the PCRA court if they are supported by the record, even where the record could support a contrary holding."). Based on the foregoing, appellant's claim that counsel was ineffective in failing to call Glenn as an alibi witness fails.

## C. Ineffective assistance of appellate counsel claims

### *Issues IV-V*

We now turn to appellant's claims that appellate counsel[1] rendered ineffective assistance of counsel. Appellant first contends that appellate counsel was ineffective in failing to argue on direct appeal that the Commonwealth: (a) improperly cross-examined appellant on his business practices; and (b) improperly bolstered the testimony of Troy Hill and Sean Harris. (*See* appellant's brief at 36, 40-41.) We disagree. As discussed, appellant has failed to adequately demonstrate that his underlying claims of trial counsel's purported ineffectiveness in this regard were of arguable merit, and thus, it logically follows that counsel, on direct appeal, cannot be deemed ineffective for failing to raise these meritless issues. *See Commonwealth v. Elliott*, 80 A.3d 415, 427 (Pa. 2013) (stating, "[i]f the petitioner cannot prove the underlying claim of trial counsel ineffectiveness, petitioner's derivative claim of appellate counsel ineffectiveness fails." (citation omitted)), *cert. denied*, ___ U.S. ___, 135 S.Ct. 50 (2014).

In reaching this decision, we recognize that appellate counsel testified at the PCRA hearing that, in his experience, it is not advisable to raise every potentially meritorious issue on appeal and he made the strategic decision to

---

[1] As noted, appellant was represented during both his jury trial and on direct appeal by Dennis Cogan, Esq.

raise only those issues that gave appellant the best chance at prevailing. (*See* notes of testimony, 11/22/16 at 136-138.)

***Issue IX***

Appellant also contends that *if* appellate counsel were aware that the Commonwealth had violated ***Brady*** by failing to disclose during the pendency of his direct appeal that Troy Hill had shot Khalil Gardner, he was ineffective in failing to file a motion pursuant to Pa.R.Crim.P. 720(C)[2] seeking a new trial based on after-discovered evidence. (Appellant's brief at 50-51.) For the following reasons, this claim fails.

First, this claim is wholly speculative given that appellant is unable to affirmatively demonstrate that appellate counsel became aware of this ***Brady*** violation during the pendency of his direct appeal. Second, as discussed, appellant has failed to demonstrate prejudice with respect to this ***Brady*** claim, as the Commonwealth presented overwhelming evidence of appellant's guilt. "A petitioner establishes prejudice when he demonstrates that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Commonwealth v. Johnson***, 966 A.2d 523, 533 (Pa. 2009) (citations and internal quotation marks omitted). Appellant has clearly failed to satisfy this burden in this instance,

---

[2] Rule 720(C) provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(C).

and thus, appellate counsel cannot be found ineffective for failing to pursue this meritless claim. **See Freeland**, 106 A.3d at 778.

## D. Cumulative prejudice

***Issue X***

Appellant's final argument on appeal is that the cumulative prejudice suffered from counsel's purported ineffectiveness rendered his trial unconstitutionally unfair. (**See** appellant's brief at 52-53.) We disagree. Our supreme court has recognized that "no number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually." ***Johnson***, 966 A.2d at 532 (citations omitted). However, when the failure of individual claims is grounded in lack of prejudice, as are some of appellant's claims in the instant matter, then "[the] cumulative prejudice from individual claims **may** be properly assessed in the aggregate" ***Hutchinson***, 25 A.3d at 319 (Pa. 2011) (citation omitted). Here, we are satisfied there is no cumulative prejudice warranting relief. Appellant's ineffectiveness claims at issue are, in large part, factually and legally independent, with no reasonable connection warranting a conclusion that their cumulative effect amounts to actual prejudice. Accordingly, appellant's final claim fails.

For all the foregoing reasons, we affirm the February 10, 2017 order of the PCRA court.

Order affirmed.

J. A16040/18

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/18