J-S73007-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellee :
:
v. :
:
GEORGES SAGE BERLIN :
:
Appellant : No. 166 WDA 2018

Appeal from the PCRA Order January 17, 2018
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0004430-2012

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY GANTMAN, P.J.: FILED FEBRUARY 27, 2019

Appellant, Georges Sage Berlin, appeals from the order entered in the Westmoreland County Court of Common Pleas, which denied his first petition brought pursuant to the Post-Conviction Relief Act ("PCRA"), at 42 Pa.C.S.A. §§ 9541-9546. We affirm in part, vacate in part, and remand with instructions.

The relevant facts and procedural history of this case are as follows. On October 18, 2012, Appellant raped Victim at her residence. A jury convicted Appellant on April 10, 2014, of one count each of rape by forcible compulsion, rape by threat of forcible compulsion, involuntary deviate sexual intercourse ("IDSI") by forcible compulsion, IDSI by threat of forcible compulsion, aggravated indecent assault, indecent assault, indecent assault by forcible compulsion, unlawful restraint, and stalking. The court sentenced Appellant

on September 5, 2014, to an aggregate term of 17 to 34 years' imprisonment plus 5 years' probation. The court also notified Appellant of his requirement to register and report for life as a Tier III offender under the Sexual Offender Registration and Notification Act ("SORNA"). On June 30, 2015, this Court affirmed the judgment of sentence, and our Supreme Court denied petition for allowance of appeal on February 29, 2016. See Commonwealth v. Berlin, 122 A.3d 1149 (Pa.Super. 2015) (unpublished memorandum), appeal denied, 635 Pa. 729, 132 A.3d 456 (2016).

On October 11, 2016, Appellant filed a timely pro se first PCRA petition. The PCRA court appointed counsel, who filed an amended PCRA petition on April 5, 2017, and argued trial counsel interfered with Appellant's right to testify at trial and did not call available character witnesses in relation to both Appellant and Victim, constituting ineffective assistance of counsel. Appellant filed an amended pro se PCRA petition on April 17, 2017, which listed the potential character witnesses and argued trial counsel did not investigate the crime scene or allow Appellant to hear his recorded phone call with Victim prior to trial. On July 13, 2017, PCRA counsel filed a motion to withdraw due to irreconcilable differences with Appellant, which the following day the PCRA court granted and appointed new counsel.

The PCRA court held an evidentiary hearing on November 20, 2017. At the conclusion of the hearing, the PCRA court requested second PCRA counsel to file an amended PCRA petition listing the potential character witnesses

whom Appellant claimed were available to testify at trial. Second PCRA counsel complied on December 21, 2017. On January 17, 2018, the PCRA court denied PCRA relief. Appellant timely filed a notice of appeal on January 25, 2018. The following day, the PCRA court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely filed a Rule 1925(b) statement on February 13, 2018.

Appellant raises the following issue for our review:

> WHETHER THE [PCRA COURT] ERRED IN DENYING PCRA RELIEF DESPITE THE FACT THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL[?]

(Appellant's Brief at 3).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record supports the court's determination and whether the court's decision is free of legal error. Commonwealth v. Ford, 947 A.2d 1251 (Pa.Super. 2008), appeal denied, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. Commonwealth v. Boyd, 923 A.2d 513 (Pa.Super. 2007), appeal denied, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. Commonwealth v. Dennis, 609 Pa. 442, 17 A.3d 297 (2011).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Rita D.

- 3 -

Hathaway, we conclude Appellant's issue merits no relief. The PCRA court opinion comprehensively discusses and properly addresses the question presented. (See PCRA Court Opinion, filed January 17, 2018, at 11-19) (finding: trial counsel was not ineffective for failing to call Appellant as witness during trial; Appellant testified unequivocally during colloquy at trial that his decision not to testify was of his own volition; trial counsel testified at PCRA hearing that Appellant initially wanted to testify at trial but changed his mind and told counsel of this decision; Appellant incredibly testified trial counsel told Appellant not to testify at trial, and that Appellant did not remember colloquy; trial counsel's failure to call character witnesses was not ineffective assistance of counsel; at trial, counsel stated he did not intend to introduce evidence of Appellant's character; trial counsel stated he had discussed with Appellant possibility of presenting character evidence, and both Appellant and counsel agreed not to introduce character evidence; during PCRA hearing, trial counsel testified that he had discussed with Appellant the potential introduction of crimen falsi if he provided character evidence; assuming potential witnesses would have been available and willing to testify at trial, record indicates trial counsel acted reasonably; finally, trial counsel was not ineffective for failing to allow Appellant opportunity to listen to recorded phone call between him and Victim; at PCRA hearing, trial counsel credibly testified Appellant had opportunity to listen to recording and discuss content; Appellant informed trial counsel during trial that Appellant believed recording had been

doctored, however, at trial, recording was properly authenticated and there is no indication recording was doctored). The record supports the court's decision. Accordingly, we affirm Appellant's issue on the basis of the PCRA court's opinion.

Nevertheless, our Supreme Court declared SORNA unconstitutional, because it violates the ex post facto clauses of both the United States and Pennsylvania Constitutions. Commonwealth v. Muniz, 640 Pa. 699, 164 A.3d 1189 (2017), cert. denied, ___ U.S. ___, 138 S.Ct. 925, 200 L.Ed.2d 213 (2018). The Muniz court determined SORNA's purpose was punitive in effect, despite the General Assembly's stated civil remedial purpose. Id. at 748-49, 164 A.2d at 1218. Therefore, a retroactive application of SORNA to past sex offenders violates the ex post facto clause of the United States Constitution. Id. SORNA also violates the ex post facto clause of the Pennsylvania Constitution because it places a unique burden on the right to reputation and undermines the finality of sentences by enacting increasingly severe registration law. Id. at 756-57, 164 A.2d at 1223. Further, Muniz created a substantive rule that retroactively applies in the collateral context. Commonwealth v. Rivera-Figueroa, 174 A.3d 674, 678 (Pa.Super. 2017). Legality of sentence is not waivable in the collateral context, as long as the court has jurisdiction to hear the claim. Commonwealth v. Berry, 877 A.2d 479, 482 (Pa.Super. 2005) (en banc), appeal denied, 591 Pa. 688, 917 A.2d 844 (2007). Consequently, we elect to review the legality of Appellant's

sentence sua sponte. See Commonwealth v. Randal, 837 A.2d 1211, 1214 (Pa.Super. 2003) (en banc) (stating appellate court can raise and review legality of sentence sua sponte).

Instantly, Appellant committed his offenses on October 18, 2012. At that time, Megan's Law III applied, which would have required Appellant to register as a sex offender for life. See 42 Pa.C.S.A. § 9795.1(b)(2) (expired December 19, 2012). SORNA became effective on December 20, 2012. See 42 Pa.C.S.A. §§ 9799.10, 9799.41. The court sentenced Appellant on September 5, 2014, and required Appellant to register for life as a Tier III offender under SORNA. See 42 Pa.C.S.A. § 9799.14(d)(4). Appellant, however, committed his offenses when Megan's Law III was applicable, and while Megan's Law III and SORNA both require a person convicted of IDSI to register for life, the increased reporting requirements of SORNA constitute greater punishment for Appellant. See Muniz, supra. Thus, the application of SORNA to Appellant violates the ex post facto clauses of the United States and Pennsylvania Constitutions.[1] See id.; Rivera-Figueroa, supra. Further, the General Assembly created Subchapter I through Act 10 and amended in Act 29, in response to Muniz and its progeny. See H.B. 1952, 202 Gen.

_____

[1] We note this Court granted en banc review in two cases, which may implicate which sexual offender registration scheme applies to Appellant's circumstance. See Order, Commonwealth v. Wood, 1193 & 1194 MDA 2017 (Pa.Super. filed April 20, 2018); Order, Commonwealth v. Lippincott, 2057 EDA 2014 (Pa.Super. filed April 20, 2018).

Assem., Reg. Sess. (Pa. 2018), Act 29 of 2018; H.B. 631, 202 Gen. Assem., Reg. Sess. (Pa. 2018), Act 10 of 2018. Subchapter I addresses sex offenders who committed an offense before December 20, 2012. See 42 Pa.C.S.A. §§ 9799.51-9799.75. Accordingly, we vacate the portion of Appellant's judgment of sentence that required him to register as a lifetime sexual offender under SORNA, and remand to the trial court to instruct Appellant on his proper reporting requirements under Megan's Law III.

Order affirmed; SORNA requirements vacated; case remanded with instructions. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2019

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
                             )
VS.                          )
                             )        No.   4430 C 2012
GEORGES SAGE BERLIN,         )
                             )
                 Defendant.  )

## STATEMENT OF THE COURT
## ISSUED PURSUANT TO PA.R.A.P. RULE 1925

**AND NOW,** this 25 day of February, 2018, it appearing to this Court that the Defendant filed a Notice of Appeal from the Order of Court entered on January 17, 2018 dismissing Defendant's petition for post-conviction relief, and that Defendant filed a Concise Statement of the Errors Complained of on Appeal as Ordered by this court, pursuant to Rule 1925(a) of the Rules of Appellate Procedure, the reasons for said decision appear in the Court's Opinion dated January 17, 2018. A copy of that Opinion is attached hereto for reference.

**BY THE COURT:**

Rita Donovan Hathaway, President Judge

ATTEST:

c.c.    File
        Judith Petrush, Esq., Assistant District Attorney
        Michael E. DeMatt, Esq., Counsel for Defendant
        Pamela Neiderhiser, Esq., Court Administrator's Office

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA - CRIMINAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA ) | |
| ) | |
| vs. ) | No.   4430 C 2012 |
| ) | |
| GEORGES SAGE BERLIN, ) | |
| Defendant. ) | |

## ORDER AND OPINION OF COURT

### I.   FACTUAL AND PROCEDURAL HISTORY:

The charges in this case arose from an incident that occurred on or about October 18, 2012 in Murrysville, Westmoreland County.  The testimony at trial established that the victim, Holly White, lived with her two minor daughters in the municipality of Murrysville in 2012.  White testified that she met Defendant through Facebook, and that they became romantically involved in the summer of 2012.  (TT 54-56).[1]   The relationship was rocky, however, and White ended the relationship with Berlin in September of 2012.  Although Defendant sought reconciliation, White was not "sold" on the idea that it was a good decision, though Defendant stated that "even though we're not married . . . God promised us for each other." (TT 61).

Eventually, White broke off all contact with Defendant because of his troubling behavior. (TT 60-64).  For example, White testified that Defendant became angry when she joined a different church from Defendant, and stated that he did not want her around

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the trial in this matter, held April 7-10, 2014 and made a part of the record herein.

1

the church's pastor, "just trying to control who I was around." (TT 60). White also stated that Defendant would often "be very displeased" with the way she would cook, and would criticize her in front of her children. (TT 60).

At approximately 11:30 p.m. on October, 18, 2012, White was preparing for bed when the doorbell rang. When White opened the front door, "[Defendant] kept saying, let me in, let me in. He got real loud outside, which made me concerned for my neighbors because it's a very quiet neighborhood so I let him in." (TT 67). As soon as Defendant entered her home, he pushed her up against the wall and told her repeatedly that they were meant to be together. (TT 67). White asked Defendant to leave, but he continued to "rant." She was eventually able to move into her living room, hoping to diffuse the situation, but Defendant became more agitated. (TT 68-69). He called her a "whore" for having sex with other men, and said that there were spirits in the house. (TT 69). White repeatedly asked Defendant to leave her home. Defendant began groping and licking her breasts, pushed her onto the couch, and physically and sexually assaulted her.

White fought against Defendant and became hysterical when she felt that she could not breathe. She stated that "trying to fight him off was really difficult because it was hurting me." (TT 70) She also testified that she was "pushing him, kicking him, whatever I could do to get him to push away." (TT 70). At that point, Defendant stopped the assault and began to cry. He stated that "he didn't mean to rape me. That he was sorry and that he was just crazy over me and I'm his." (TT 71). At some point, White thought that Defendant was beginning to leave, but he instead restrained White in a bear hug when she attempted to retrieve her phone. (TT 72). He then pulled White's pants down,

2

and as she reached for her house phone, he took it from her and threw it across the room. (TT 73). At that point, White threatened to retrieve a knife if he did not leave. Defendant responded by stating "go ahead . . . I'm not going to live without you. (TT 75).

Defendant became physical again toward White. White testified that "I couldn't fight him anymore. I was hurting every time I tried to hit him, even with my arms, because he was on top of me." (TT 76). Defendant then removed White's panties. White then testified: "He started to lick me down there and at least twice he bit me . . . on my skin, just right at the top of my vagina. I think I was struggling at that point to just not totally zone out because I was frozen." (TT 78). Defendant pinned White's legs in the air and penetrated her vaginally. (TT 79). After Defendant ejaculated inside of her, Defendant stood up and White locked herself in her bathroom. (TT 81). Then:

> He kept yelling from outside the room . . . for me to let him in, and the next thing I know the door is opening. He's got a kitchen knife. He jimmied the door open and he handed me my clothes and helped me get off the toilet because I was too weak at that point to stand back up. (TT 81).

Defendant again began speaking in a rambling and a threatening manner. (TT 82). Finally, Defendant told White that he and his family would "take care" of her ex-husband, and he threatened that if he ever saw her with another man, he would kill her. Defendant also instructed White to turn her cell phone on, as he would call her on his way home. When Defendant left shortly thereafter, White believed that it was in the early morning hours of October 19, 2012. Her children were still asleep upstairs. (TT 81-83).

White testified that she locked all of the doors and went upstairs to her bedroom. She texted a friend, but her friend did not answer the phone. She then located the number

3

for a women's shelter and spoke to a counselor from the Blackburn Center. (TT 84). She testified that she did not call the police because she did not want to wake her neighbors and her children. Although she was in considerable pain, she waited until her children were on the bus to school that morning before she went to Forbes Regional Hospital in Monroeville. There, she was examined, a rape kit was performed, and her clothing was collected. (TT 83-87). She agreed to meet with Murrysville Police, and gave a written statement. While driving back to her residence, White noticed that a vehicle was following her. When the car flashed its lights at her to pull over, she did so. Defendant was driving the car, which she then recognized as being his mother's vehicle, and he rolled down the window as if he wanted to speak with her. White testified that she was afraid, and so she immediately pulled away and called the police. Defendant continued to follow her, at times pulling in front of her vehicle to block her progress. White was eventually able to drive back to the police station. (TT 92-94).

Defendant called White's cell phone on numerous occasions and left several voice messages, which White recorded to a separate medium. White agreed to return Defendant's phone calls while having the conversation recorded by law enforcement. In that recorded conversation, Defendant apologized repeatedly to White for his actions and begged her to forgive him for raping her. (TT 104-105, Commonwealth's Exhibit #12 and #13).

Kiley Schultz testified that she was employed as an emergency medicine physician assistant at Forbes Regional Hospital in Monroeville on the day of the crime. (TT 184, 191). She stated that she did perform an examination of Holly White on October 19, 2012

4

at approximately 9:05 a.m. (TT 192). White informed her that she had been raped, and Schultz stated that White appeared tearful and emotional. (TT 192). When Schultz asked her for details, White stated that she had broken off a relationship with a man a few weeks prior, and that somewhere between the hours of 11:00 p.m. and 2:00 a.m. the previous evening, they had a verbal altercation because she did not want him at her home. (TT 195). He then pushed her onto the couch, and she pulled out some of his hair trying to escape. (TT 196). White then stated that she eventually was so tired that she could no longer fight Defendant off of her, and that Defendant digitally and orally penetrated her vagina. He then engaged in sexual intercourse with her, and became angry when she would not make eye contact or speak to him while she was being raped. (TT 196).

Schultz then performed a physical examination. She found bruising on her arm, which resembled finger marks. (TT 196-97). She also performed a genital exam, and did not note any external abnormalities or internal injuries. (TT 197). She also obtained swabs for the rape kit at that time. (TT 197).

The Commonwealth also introduced a stipulaton stating that if called to testify, Bradley McLaughlin, a forensic scientist supervisor with the Pennsylvania State Police, would establish that a presumptive chemical test indicated the presence of seminal material in the vaginal and rectal sample; however, no spermatozoa were identified. (TT 216). Further, swabs from the vaginal and rectal samples were prepared for DNA analysis. Other samples, including pubic hairs, buccal swabs, and fingernail scrapings, were also prepared for DNA analysis. (TT 217). Buccal swabs were also retrieved from Defendant. (TT 218).

5

Catherine Palla, forensic DNA scientist with the Pennsylvania State Police DNA Lab, testified that she analyzed DNA samples received from subjects Holly White and Defendant. (TT 227). She testified that Defendant's DNA was present in the vaginal sample, and that his DNA was consistent with the rectal sample. (TT 235).

Richard King testified that he was working as a detective for the Murrysville Police Department on October 19, 2012, when he met with Holly White shortly after 5 p.m. at Forbes Hospital. Detective King noted that while he intended to obtain a written statement from White at the hospital, she appeared to be exhausted, so he determined that she needed to rest and they would obtain a written statement at a later date. (TT 240). White traveled to the police station the following day, and informed Sergeant King that Defendant was still continuously trying to contact her by phone. (TT 241). At that time, Sergeant King and White planned to set up a consensual wiretap on the following Monday. (TT 241). After White left the police station at approximately 10:30 p.m., however, he learned that Defendant attempted to make contact with White while they were both in their vehicles. (TT 244). Sergeant King testified that she returned approximately one hour later and appeared to be extremely shaken. (TT 244).

Defendant was charged by Criminal Information with one count of Rape by Forcible Compulsion, 18 Pa.C.S.A. §3121(a)(1), one count of Rape, Threat of Forcible Compulsion, 18 Pa.C.S.A. §3121(a)(2), one count of Involuntary Deviate Sexual Intercourse, Forcible Compulsion, 18 Pa.C.S.A. §3123(a)(1), one count of Involuntary Deviate Sexual Intercourse, 18 Pa.C.S.A. §3123(a)(2), one count of Aggravated Indecent Assault without Consent, 18 Pa.C.S.A. §3125(a)(1), one count of Indecent

6

Assault, 18 Pa.C.S.A. §3126(a)(1), one count of Indecent Assault, 18 Pa.C.S.A. §3126(a)(2), one count of Unlawful Restraint, 18 Pa.C.S.A. §2902(a)(2), and one count of Stalking, 18 Pa.C.S.A. §2709.1(a)(1).

Defendant was represented by Attorney Brian Aston at trial, which commenced on April 7, 2014. Defendant was found guilty of all charges on April 10, 2014.Defendant was sentenced on September 5, 2014 to an aggregate period of 17 to 34 years incarceration, followed by 5 years State probation.

Defendant filed a Notice of Appeal directly to the Superior Court, and the Court's judgment of sentence was affirmed by the Superior Court on June 30, 2015. Defendant's Petition for Allowance of Appeal was denied by the Pennsylvania Supreme Court on February 29, 2016.

Defendant filed a *pro-se* PCRA petition on October 11, 2016. The Court appointed Attorney Emily Smarto to represent Defendant. Attorney Smarto filed an amended PCRA petition on April 5, 2017. Attorney Smarto filed a motion to withdraw as counsel on July 14, 2017, citing irreconcilable differences with Defendant. The Court then appointed Attorney Michael DeMatt to represent Defendant, and ordered him to file any supplemental motions within 45 days. He did not file any additional motions, and an evidentiary hearing was held on this matter on November 20, 2017.

## II.    ELIGIBILITY FOR RELIEF:

The requirements for eligibility for relief under the Post-Conviction Relief Act are set forth both in the Act itself (42 Pa.C.S. §9541, *et. seq.*) and in the Rules of Criminal Procedure (Pa.R.Crim.P. Rules 901 and 902). Generally speaking,

7

> PCRA petitioners, to be eligible for relief, must, *inter alia*, plead and prove their assertions by a preponderance of the evidence. Section 9543(a). Inherent in this pleading and proof requirement is that the petitioner must not only state what his issues are, but also he must demonstrate in his pleadings and briefs how the issues will be proved. Moreover, allegations of constitutional violation or of ineffectiveness of counsel must be discussed "in the circumstances of the case." Section 9543(a)(2)(i-ii). Additionally, the petitioner must establish by a preponderance of evidence that because of the alleged constitutional violation or ineffectiveness, "no reliable adjudication of guilt or innocence could have taken place." Section 9543(a)(2)(i-ii). Finally, petitioner must plead and prove that the issue has not been waived or finally litigated, §9543(a)(3), and if the issue has not been litigated earlier, the petitioner must plead and prove that the failure to litigate "could not have been the result of any rational, strategic or tactical decision by counsel." Section 9543(a)(4).

*Comm. v. Rivers,* 786 A.2d 923, 927 (Pa. 2001).

Further, a PCRA petition, including second and subsequent petitions, must be filed within one year of the date that the judgment of sentence becomes final. *42 Pa.C.S. §9545(b)(1); Pa.R.Crim.P. Rule 901.* The Pennsylvania Supreme Court "has repeatedly stated that the PCRA timeliness requirements are jurisdictional in nature and, accordingly, a PCRA court cannot hear untimely PCRA petitions." *Comm. v. Ligons,* 971 A.2d 1125, 1164 (Pa. 2009) (citing *Comm. v. Rienzi,* 827 A.2d 369, 371 (Pa. 2003)).

Here, Defendant's judgment of sentence was affirmed by the Superior Court on June 30, 2015. His Petition for Allowance of Appeal to the Pennsylvania Supreme Court was denied on February 29, 2016. The instant petition was filed on October 11, 2016. Therefore, his petition is facially timely.

Because Defendant is raising a claim of ineffective assistance of counsel, he must plead and prove, by a preponderance of the evidence:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.
> *Comm. v. Reed,* 971 A.2d 1216, 1221 (Pa. 2009) (citing *Comm. v. Pierce,* 527 A.2d 973, 975 (Pa. 1987)).

In his amended petition for post-conviction relief, initially filed by prior counsel Emily Smarto and adopted by current counsel Michael DeMatt, Defendant alleges that trial counsel was ineffective. Specifically, he alleges that he wished to testify on his own behalf, and informed his counsel that he wished to do so. However, counsel interfered with his right to testify by giving "incorrect advice." He also alleges that he wished to call a long list of character witnesses, none of whom were called by defense counsel. Although not contained within the amended petition, Defendant also argued at the evidentiary hearing that he was not given an opportunity prior to trial to listen to phone recordings wherein Defendant admitted to raping Victim.

## III. ANALYSIS:

Although the Court dismissed the majority of Defendant's claims at the evidentiary hearing, it will still discuss its reasoning for doing so, *infra*.

### A. WHETHER TRIAL COUNSEL WAS INEFFECTIVE WHERE DEFENDANT CLAIMED HE WISHED TO TESTIFY ON HIS OWN BEHALF, AND THAT HE WAS GIVEN "INCORRECT ADVICE" BY COUNSEL?

9

First, Defendant asserts that he wished to testify at trial, but that defense counsel incorrectly advised him that doing so would result in a harsher sentence from Judge Hathaway.

The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. *Comm.v. Uderra*, 706 A.2d 334 (Pa. 1998); *Comm. v. Bazabe*, 590 A.2d 1298, (Pa.Super. 1991). Moreover, where a defendant voluntarily waives his right to testify after a colloquy, he generally cannot argue that trial counsel was ineffective in failing to call him to the stand. *Comm. v. Peay*, 806 A.2d 22, 29 (Pa.Super.2002); *Comm. v. Schultz*, 707 A.2d 513, 520 (Pa.Super.1997). In order to sustain a claim that counsel was ineffective for failing to advise a defendant of his rights in this regard, notwithstanding an on-the-record colloquy, the defendant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf. *Comm. v. Nieves*, 746 A.2d 1102, 1104 (Pa. 2000).

Such an instance occurred in *Nieves*. There, Defendant averred and testified at the evidentiary hearing that he wished to testify, but that his attorney advised him that if he did, the Commonwealth would be able to impeach him with two prior convictions. *Id.* His trial attorney also confirmed his version of events, and acknowledged that he did not have an alternative reasonable strategy for advising the defendant not to testify. The Pennsylvania Supreme Court affirmed the trial court's determination that counsel's advice was erroneous, as Defendant's prior convictions were not crimes of dishonesty. It

10

also determined that if not for counsel's erroneous advice, Defendant would have chosen to testify on his own behalf.

Defendant clearly and unequivocally testified at trial that his decision not to testify was of his own volition. The following colloquy was conducted at Defendant's trial:

> **Aston:** Have you and I met and discussed the possibility of you testifying in reference to this matter?
> **Defendant:** Yes, we have.
> **Aston:** And have we discussed it on several occasions?
> **Defendant:** Yes, we have.
> **Aston:** And isn't it true that immediately prior to coming to court now you and I were in the holding cell discussing whether or not you should testify?
> **Defendant:** Yes, we were.
> **Aston:** Have you asked me questions concerning the possibility of you testifying?
> **Defendant:** Yes, I have.
> **Aston:** Have I informed you that is one of the things that you have the absolute right to do is testify on your own behalf and I myself as your attorney cannot make that decision for you?
> **Defendant:** Yes, you did.
> **Aston:** And did I inform you that you have to make that determination and inform both myself and the court?
> **Defendant:** Yes.
> **Aston:** And after having all of our conversations and having all of your questions answered, is it your decision whether you wish to or do not wish to testify?
> **Defendant:** I do not wish to testify.
> **Aston:** And you are doing this of your own free will?
> **Defendant:** Yes, I am.
> **Aston:** And have I promised you or threatened you with anything with regard to that decision?
> **Defendant:** No, you haven't.
> (TT 270-72)

At the evidentiary hearing, Attorney Aston detailed the conversations he had with Defendant regarding his wish to testify:

11

> **Aston**: Mr. Berlin was going to testify the whole way up through and including when the jury was impaneled. He would never specifically tell me what he was going to say with reference to the phone [recording]. He just kept saying you put me up there, I'll take care of the recording. I was just trying to tell her what she wanted to hear so that we could get back together. Then when the first officer took the stand and I believe I had him admit, he finally kind of broke down a little bit on the stand because Mr. Berlin had been accused of following this woman around later on and calling her and stuff, and when I pressed the officer about why he didn't do more that night to try to locate him, he admitted that he didn't do his job, that he just wanted to get out of town . . . When the officer said that I sat down and Mr. Berlin leaned over and said to me, I'm not testifying, you've got to take care of this yourself.
> (PT 13-14).[2]

Defendant testified at the evidentiary hearing that "[Aston] told me not to testify." (TT 24). When asked why he told Defendant not to testify, Defendant stated "I have no idea.

He never brought up my prior record [or] anything." (TT 24). He continued:

> **Defendant**: When it was time for me to testify, I guess after [Victim] took the stand, we went downstairs and he just says, I'm advising you not to testify. I said okay.
> **ADA Petrush**: Do you recall being asked a series of questions on the record about whether or not you wished to testify?
> **Defendant**: No.
>
> . . .
>
> **Defendant**: I told him I would like to testify. He – when we were downstairs meeting before we came up, he told me if you testify Judge Hathaway will give you more time. Those were his exact words.
> (TT 25-26).

---

[2] Numerals in parenthesis preceded by the letters "PT" refer to specific pages of the transcript of the evidentiary hearing in this matter, held November 20, 2017, and made a part of the record herein.

Defendant testified that he could not recall the colloquy conducted at trial. The Court found that Attorney Aston's testimony at trial was credible, and that Defendant's testimony was extremely incredible. Attorney Aston testified that Defendant informed him that he did not wish to testify on his own behalf, despite his prior statements stating the opposite. Based on the record and the testimony presented at the evidentiary hearing, Defendant's claims cannot overcome his own testimony presented at trial. There is no evidence that Attorney Aston interfered with his right to testify, or that he was given incorrect advice regarding this right. For these reasons, the Court properly dismissed this claim at the evidentiary hearing, as Defendant's assertion is meritless, defense counsel acted reasonably, and there is no indication that the outcome of the trial would have been different had Defendant testified.

### B. WHETHER COUNSEL WAS INEFFECTIVE FOR FAILING TO CALL CHARACTER WITNESSES DESPITE DEFENDANT'S CONTENTION THAT HE WISHED TO DO SO?

Next, Defendant avers that defense counsel was ineffective for failing to call character witnesses where a list of names was provided to him pretrial. In his PCRA addendum, Defendant lists a number of witnesses that he wished to call both for Victim's "bad character," as well as for Defendant's reputation for peacefulness.

Where a defendant claims that counsel was ineffective for failing to call a particular witness, a defendant must offer proof of that witness's availability to testify, as well as an adequate assertion that the substance of the purported testimony would make a difference in the case, so that Defendant was so prejudiced that he was denied a fair trial. *Comm. v. Clark*, 961 A.2d 80, 90 (Pa. 2008). "A petitioner establishes prejudice

13

when he demonstrates that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Comm. v. Johnson***, 966 A.2d 523, 533 (Pa. 2009) (citations and internal quotation marks omitted). It is well settled that "[a] failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy." ***Comm. v. Sneed***, 45 A.3d 1096, 1109 (Pa. 2012).

Further:

> It has long been the law in Pennsylvania that an individual on trial for an offense against the criminal law is permitted to introduce evidence of his good reputation in any respect which has "proper relation to the subject matter" of the charge at issue. Such evidence has been allowed on a theory that general reputation reflects the character of the individual and a defendant in a criminal case is permitted to prove his good character in order to negate his participation in the offense charged. The rationale for the admission of character testimony is that an accused may not be able to produce any other evidence to exculpate himself from the charge he faces except his own oath and evidence of good **character.**
>
> ***Comm. v. Johnson***, 27 A.3d 244, 248 (Pa.Super. 2011) (citation and emphasis omitted)

The ability of the defense to introduce witnesses testifying to a victim's character trait of untruthfulness is rather limited. In ***Comm. v. Minich***, 4 A.3d 1063 (Pa.Super. 2010), where defense counsel sought to introduce witnesses who would testify that a

14

victim was caught lying in matters unrelated to the sexual assault case, the Court held that such evidence was inadmissible as per Pa.R.E. 608.[3]

At trial, Attorney Aston stated on the record reasons that he did not wish to introduce character witnesses:

> **Aston**: . . . I have no intention whatsoever of getting into character. In the discovery that was provided to me, not the most recent stuff, but the stuff awhile back, there was information in there concerning news articles and stuff that my client was avoiding paying child support in Allegheny County, and I think the one judge referred to him as a con man or someone who would say whatever he had to say to prevent him from having to pay child support. I don't think there's any relevance whatsoever to that.
> (TT 8).

A colloquy was also conducted at trial, which affirmed Defendant's wish not to introduce character witnesses on his own behalf:

> **The Court**: Did you discuss with your client the possibility of character witnesses?
> **Aston**: I did, your Honor. I discussed that with him in light of some of the evidence that was out there[.] I think we both agree that it would be best not to open some of those doors.
> **The Court**: Because I'm sure you explained to him if he did present a character witness then the Commonwealth could

---

[3] The Court further held that:

> In light of the recognized interpretation of the term "pertinent" under Pa.R.E. 404(a)(1) relating to the accused and consistent precedent dealing with victims who testify, we conclude that a "pertinent" character trait for purposes of Pa.R.E. 404(a)(2)(i) is limited to a character trait of the victim that is relevant to the crime or defense at issue in the case. Therefore, whenever the accused seeks to offer character evidence for purposes of attacking or supporting the credibility of a victim who testifies, the admissibility of such evidence is governed by Pa.R.E. 608 and proof of specific incidents of conduct by either cross-examination or extrinsic evidence is prohibited. To hold otherwise would allow the phrase "pertinent trait of character" in Pa.R.E. 404(a)(2) to modify established case law defining the parameters of permissible evidence to impeach or bolster the credibility of witnesses.
> *Minich*, 4 A.3d at 1072.

15

come back on rebuttal with a character witness to rebut that character trait.

**Aston**: Correct, your Honor.

**Court**: Mr. Berlin, are you in agreement with that.

**Defendant**: Yes, I am.

(TT 9-10).

At the evidentiary hearing, Defendant testified that he provided Attorney Aston with a "huge list" of character witnesses – he also testified that he did not recall having any discussions with Attorney Aston as to whether it would be beneficial to call character witnesses, and that he never indicated that he did not wish to have any character witnesses called. (TT 23-24).

Attorney Aston testified at the evidentiary hearing as follows:

> **ADA Petrush**: What specifically do you recall [the conversation regarding character witnesses] being?
>
> **Aston**: That if we called any character evidence then his prior conviction, I know he had a prior conviction for burglary and he may even have had a prior sex crime that may or may not have come in. I know the burglary definitely would have because that's a *crimen falsi* and that would have come in and therefor character evidence was not an option for us and we had discussed that.
>
> **ADA Petrush**: At any point did Mr. Berlin indicate that despite the fact that certain prior convictions may come in that he still wished to have character witnesses testify on his behalf?
>
> **Aston**: No, he fully understood why we could not call them.
> (PT 11).

Regarding witnesses that Defendant wished to introduce "to impugn [Victim's] integrity for truthfulness," Attorney Aston testified that "we were having discussions about potential witnesses and even the examination of the Victim herself, because the Rape Shield Law in Pennsylvania extremely limits what we're allowed to and not allowed to [do], we would have had those discussions. (PT 15).

16

Attorney Aston correctly informed Defendant that his conviction for burglary constituted *crimen falsi* with which Defendant could be impeached. *See, e.g., Comm. v. Harris*, 884 A.2d 920 (Pa.Super. 2005) (holding that 20-year old conviction for burglary was admissible to impeach defendant if he testified). Although Defendant alleged that his conviction was for Criminal Trespass, and not Burglary, the Court notes that the crime of Criminal Trespass also represents a *crimen falsi* offense. *Comm. v. Davis*, 17 A.3d 390, 397 (Pa.Super. 2011).

Moreover, evidence regarding Victim's reputation for truthfulness was not introduced by the Commonwealth. Defendant does not allege that the witnesses listed had evidence that Victim lied about the incident in question.

Assuming, *arguendo*, that the witnesses listed would have been available and willing to testify, the evidence presented still signifies that defense counsel acted reasonably, and Defendant was not prejudiced by the witness's exclusion. The witnesses which Defendant listed in his addendum to be called for Victim's reputation included mostly Victim's family members, including her father, mother, sister, and brother-in-law. Defendant does not allege that these witnesses possessed evidence suggesting that Victim lied about the incident. Therefore, it seems rather unlikely that evidence of Victim's untruthfulness in matters not related to the crime would have been admissible or proper. Attorney Aston acted reasonably, and informed Defendant that the type of evidence which could be introduced against Victim's character was limited as per the rape shield law.

17

Attorney Aston credibly testified at both the trial and evidentiary hearing as to his reasons why he did not wish to introduce character witnesses on Defendant's behalf. Defendant testified at trial that he agreed with Attorney Aston, despite his conflicting testimony at the evidentiary hearing. For these reasons, Defendant's claims regarding character witnesses are meritless and cannot garner relief.

### C. WHETHER TRIAL COUNSEL WAS INEFFECTIVE WHERE DEFENDANT ASSERTS THAT HE DID NOT HAVE THE OPPORTUNITY TO REVIEW RECORDED EVIDENCE PRIOR TO TRIAL?

Although not contained within the amended PCRA petition, Defendant alleged at the evidentiary hearing that he was not given the opportunity to listen to recorded phone conversations in which Defendant admitted to raping Victim prior to trial. He also alleged that the evidence was "doctored" or altered in some manner. This argument was both completely meritless and not properly formed or argued.

At the evidentiary hearing, trial counsel Brian Aston testified that he had discussions with Defendant regarding the contents of a recorded phone call between Defendant and White. He stated that Defendant had an opportunity to listen to the recording. (PT 8). He elaborated:

> I know that he had an opportunity to listen to it prior to the trial. We talked about it nearly every single time that we met because I believe, if I recall correctly, there were three separate instances in that single phone call when Mr. Berlin admitted that he had raped this woman. That's what his case was going to come down to is whether or not he could provide an explanation to the jurors that they would be willing to accept as to why he would indicate to her not once,

18

not twice, but I believe three separate occasions that he had raped her.
(PT 8-9).

Attorney Aston also indicated that Defendant did inform him that he believed the recording had been doctored. (PT 10). He testified that "when I pressed him about specifically what [had been doctored] . . . he just said it doesn't sound right." (PT 10).

On the other hand, Defendant averred that the first time he heard the evidence was at trial. (PT 22). Although he states he had not heard the recording prior to trial, he testified that after it was played in the courtroom, "I wrote him some notes and told him certain things were missing from the phone call." The phone call was recorded nearly 2 years prior to trial. (PT 22).

Although it is unclear, it appears that Defendant wishes to forward an ineffective assistance of counsel claim in relation to this matter. The Court determined that the claim was meritless, and that Attorney Aston's testimony in relation to the claim was credible. The recording was properly authenticated at trial, and there is no indication whatsoever that it was doctored in any manner, barring Defendant's statement that it "doesn't sound right."

The Court also notes in passing that Defendant alleges that no DNA evidence was presented in trial. This issue is clearly frivolous and without a scintilla of support in the record; as noted by counsel, Catherine Palla, Forensic Scientist with the DNA forensic lab, testified regarding DNA evidence present in this case.

19

## IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA - CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
vs. )
) No. 4430 C 2012
GEORGES SAGE BERLIN, )
)
Defendant. )

### ORDER OF COURT

AND NOW, this _/7_ day of January, 2018, for the reasons set forth in this Court's Opinion, it is hereby **ORDERED** as follows:

1. Defendant's Petition for Post-Conviction Relief, filed pursuant to the Post Conviction Relief Act, (42 Pa.C.S. §9541 *et. Seq.*) is hereby **DISMISSED.**

2. **THE DEFENDANT IS NOTIFIED THAT ANY APPEAL TO THE SUPERIOR COURT OF PENNSYLVANIA FROM THIS COURT'S DISMISSAL OF HIS PCRA PETITION MUST BE FILED WITHIN THIRTY (30) DAYS FROM THE DATE OF THIS ORDER OF COURT.**

BY THE COURT:

Rita Donovan Hathaway, President Judge

ATTEST:

_____
Clerk of Courts

cc: File
Judith Petrush, Esq., Assistant District Attorney
Michael DeMatt, Esq., PCRA Counsel for Defendant
Georges Sage Berlin, Defendant, SCI Rockview, #LS-8555
1 Rockview Place, P.O. Box A, Bellefonte, PA 16823-0820
Pamela Neiderhiser, Esq., Court Administrator's Office

20